Katherine Anderson
WA Bar No. 41707
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org


*Counsel for Plaintiff*

\* Pending Admission *Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **UNION GOSPEL MISSION OF YAKIMA, WASH.**, <br><br>           *Plaintiff,* <br><br>     v. <br><br> **ROBERT FERGUSON**, in his official capacity as Attorney General of Washington State; **ANDRETA ARMSTRONG**, in her official capacity as Executive Director of the Washington State Human Rights Commission; and **DEBORAH COOK**, **GUADALUPE GAMBOA**, **JEFF SBAIH**, and **HAN TRAN**, in their official capacities as Commissioners of the Washington State Human Rights Commission, <br><br>           *Defendants.* | Civil Case No.: 1:23-cv-3027 <br><br> **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1. This 42 U.S.C. § 1983 action seeks to uphold and protect a Christian rescue mission's constitutional right to operate free from state interference to advance and fulfill its religious calling.

2. Union Gospel Mission of Yakima, Wash. ("the Mission") is a private nonprofit religious organization that serves the Yakima community through its homeless shelter, addiction-recovery programs, outreach efforts, meal services, and medical and dental clinics.

3. The Mission's Christian religious beliefs are the foundation for its existence and are the very reason it serves the homeless, hungry, and hurting.

4. And because the Mission shows biblical love not only by caring for people's physical needs, but also by caring for their spiritual needs, its overarching goal through all of its programs and services is to spread the Gospel of Jesus Christ and Christian teachings to others.

5. The Mission serves everybody equally, yet it furthers its religious purpose by maintaining an internal body of coreligionists: likeminded believers who agree with and live out the Mission's Christian beliefs and practices.

6. The Mission's employees must adhere to certain Christian belief and behavior requirements—including abstaining from any sexual conduct outside of biblical marriage between one man and one

woman—in order to properly live out and represent a Christian lifestyle and to not undermine the Mission's religious message.

7. But the Washington Law Against Discrimination ("the WLAD") prohibits sexual orientation discrimination in employment, and Defendants view the Mission's Christian behavior requirement on marriage and sexuality as unlawful sexual orientation discrimination under the WLAD.

8. The WLAD used to protect the Mission by exempting religious nonprofit organizations from its provisions, but the Washington Supreme Court recently gutted the religious employer exemption, reducing it to the "ministerial exception." *See Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231 (2021), *cert. denied,* 142 S. Ct. 1094 (2022). Although the United States Supreme Court did not review the case because of its interlocutory posture, Justices Alito and Thomas noted that the "Washington Supreme Court's decision may warrant [the U.S. Supreme Court's] review in the future" because the "Washington Supreme Court's decision to narrowly construe [Washington's] religious exemption" may "have created a conflict with the Federal Constitution." 142 S. Ct. at 1096–97 (Alito, J., respecting the denial of certiorari).

9. Post-*Woods*, Defendant Ferguson has made clear the State's position that the WLAD now prohibits *religious organizations* from considering sexual orientation in hiring their non-ministerial

employees: "[W]hile the First Amendment clearly protects [religious organizations'] employment practices with respect to [their] ministers, those protections do not extend to discrimination against [their] non-ministerial employees, to whom the WLAD's prohibition of employment discrimination on the basis of sexual orientation would apply." Motion to Dismiss at 17, *Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022).

10.    Defendant Ferguson is actively enforcing the "new" interpretation of the WLAD's religious employer exemption. Within the last year, his office began investigating a private Christian university upon the belief that the university's lifestyle expectations policy—which prohibits employees "from engaging in sexual intimacy outside" of biblical marriage between one man and one woman—discriminated based on sexual orientation. Complaint at ¶¶ 30–31, *Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022).

11.    That policy is substantially equivalent to the Mission's Christian behavior requirements on marriage and sexuality, making the Mission a target as well.

12.    As a result of the judicially re-written WLAD, and Defendants' enforcement of the WLAD, the Mission now faces significant penalties for using its religiously-based hiring criteria for "non-ministerial" employees.

13.     This recent enforcement of the WLAD against religious organizations is already harming the Mission. The Mission routinely receives applications from people who openly disagree with, or are hostile to, the Mission's religious beliefs on biblical marriage and sexuality. So, to avert WLAD liability, the Mission recently stopped posting job openings through *Indeed.com* and has removed postings and paused hiring for its IT technician and operations assistant openings—positions that would not be protected by the "ministerial exception." And the State of Washington has forced the Mission to self-censor by not allowing it to publish a statement pertaining to its Christian behavior requirements for employees online.

14.     The WLAD, and Defendants' enforcement of the WLAD, has thus chilled the Mission's religious exercise and speech, and is causing irreparable harm every single day the Mission cannot express its beliefs and hire coreligionists who live them out.

15.     Because the Mission no longer has any state statutory protection, it needs declaratory and injunctive relief protecting its federal constitutional rights to hire coreligionists and to govern its internal affairs free from government interference.

### JURISDICTION & VENUE

16.     This civil rights action raises federal questions under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17.    This Court has original jurisdiction over the Mission's federal claims under 28 U.S.C. §§ 1331 and 1343.

18.    This Court can grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

19.    This Court can award costs and attorney's fees under 42 U.S.C. § 1988(b).

20.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Mission's claims occurred within this district.

<u>**PARTIES**</u>

21.    The Mission is a 501(c)(3) nonprofit Christian rescue mission organized under the laws of the state of Washington. *See* Articles of Incorporation of the Union Gospel Mission of Yakima, Wash., a true and accurate copy attached as **Exhibit 1**. It is a religious organization under the WLAD and the United States Constitution.

22.    Defendant Robert Ferguson is the Attorney General of the State of Washington. He is sued in his official capacity only. According to his website, "[t]he Office of the Attorney General has authority to enforce Washington anti-discrimination statutes like the Washington Law Against Discrimination and the Consumer Protection Act." *Washington Laws and Enforcement Agencies*, Washington State Office of the Attorney General, https://perma.cc/2KLC-7ALM.

23.     Defendant Andreta Armstrong is the Executive Director of the Washington State Human Rights Commission. She is sued in her official capacity only.

24.     Defendants Deborah Cook, Guadalupe Gamboa, Jeff Sbaih, and Han Tran are members of the Washington State Human Rights Commission. They are sued in their official capacities only.

25.     "Established in 1949 by the Washington State Legislature, the Washington State Human Rights Commission (WSHRC) is a state agency responsible for administering and enforcing the Washington Law Against Discrimination." *About Us*, Washington State Human Rights Commission, https://perma.cc/8L88-Q3ZS.

26.     Defendants Deborah Cook, Guadalupe Gamboa, Jeff Sbaih, Han Tran, and Director Andreta Armstrong are collectively called "the Commission."

## STATEMENT OF FACTS

### I.     Union Gospel Mission of Yakima, Wash.

#### A.     The Mission's religious beliefs are the basis and purpose for everything it does.

27.     The Mission is a Christian rescue mission that has served the homeless of Yakima with the love, compassion, and kindness of Jesus Christ since 1936.

28.     The Mission was formed with the express purpose to "spread the Gospel of the Lord Jesus Christ by the conduct of a Mission or such

other methods of work as may be thought wise by the Board of Trustees." Ex. 1, p. 56.

29.    Its "very existence as an organization is an expression of [its] faith" and its "religious beliefs, life in community and Christian values represent the heart of the Mission, informing and shaping the substance and style of all [it] do[es]." Yakima Union Gospel Mission Statement of Faith. p. 61, a true and accurate copy attached as **Exhibit 2**.

30.    As such, the Mission's Christian beliefs guide and permeate everything it does.

31.    The Mission's religious beliefs are rooted in the Holy Bible, which it believes "alone is the inspired, infallible, authoritative and final Word of God; constituting unchanging truth for all people across time, place and culture." Ex. 2, p. 61.

## 1.  Acts of Service: The Mission's Christian beliefs require it to help the less fortunate.

32.    The Bible teaches Christians to care for the homeless, hungry, sick, and impoverished.

33.    For example, Jesus taught to "give to the poor," *Matthew* 19:21 (ESV), to care for "the least of these"—the hungry, thirsty, homeless, naked, and imprisoned—*Matthew* 25:35–46 (ESV), and to "love your neighbor as yourself," *Mark* 12:31 (ESV).

34.    The book of Proverbs says that "he who is generous to the poor" and "who is generous to the needy" is blessed and honors God. *Proverbs* 14:21, 31 (ESV).

35.    And the Epistle of James states, "[r]eligion that is pure and undefiled before God the Father is this: to visit orphans and widows in their affliction, and to keep oneself unstained from the world." *James* 1:27 (ESV).

36.    The Bible tells Christians to "be doers of the word, and not hearers only." *Id.* at 1:22.

37.    So to fulfill these Scriptural commands, the Mission aims to love, serve, and support the homeless and those in need.

38.    Indeed—as explained in its Bylaws—the Mission "exists to provide Christ centered rescue, recovery and restoration to men, women and children in in need." Constitution and Bylaws of the Yakima Union Gospel Mission, p. 64, a true and accurate copy attached as **Exhibit 3**.

39.    The Mission loves and serves all people "right where they are" in multiple ways, regardless of their background, religious belief, orientation, or identity. *See* Ex. 2, p. 61.

40.    For example, the Mission offers temporary and emergency shelter services for the homeless 365 days a year and provides a family shelter for families with minor children, including same sex and transgender couples with children. Last fiscal year (July 1, 2021—June

30, 2022), the Mission provided a total of 30,167 nights of shelter to 881 different adults and 3,592 nights of shelter for children.

41. The Mission's Good News Café gives out free meals three times a day to the public and shelter guests, serving 141,629 free meals to the hungry during that same period.

42. The Mission also has various programs that seek to transition the struggling out of addiction-stricken and broken situations into healthy and productive lifestyles.

43. The Mission's flagship recovery program helps people recover from drug and alcohol addictions and homelessness by inviting them into a year-long, faith-based residential community, which unfolds in three phases:

- First, the Discovery Program phase fills the gap between the temporary shelter and active participation in a recovery process by providing a safe environment for stabilization where guests can build relationships with Mission employees and learn responsibilities before committing to the New Life Program phase.

- Second, the New Life Program phase continues the Christian residential recovery community for about nine months as participants move into transitional housing, attend faith-based recovery classes and Bible studies, and undergo counseling where

they confront the hurts of the past while finding hope in Christ for the future.

- Third, the transitional Bridge Program phase supplies resources, case management, work experience opportunities, financial guidance, and spiritual and vocational classes to New Life Program graduates as they move on to the next chapter of their lives.

44.    Graduates of the Mission's religious recovery program are four times more likely to stay sober than they would if participating in traditional detox programs.

45.    Further, alongside gracious volunteer health professionals, the Mission's medical and dental centers offer completely free medical services and reduced fee dental work to those unable to pay for these necessary services.

46.    The Mission does not just serve those who come directly to its doors; it actively seeks out opportunities to serve. Nearly every day, its Outreach/Search and Rescue team physically visits different homeless areas of the community. The rescue team feeds, clothes, supplies, and develops relationships with the homeless; invites them into safe shelter; and strives to help transform their lives through the Gospel.

47.    In addition, the Mission has three thrift stores that support and fund its programs and services. The thrift stores operate by accepting donated clothing, furniture, and other merchandise and, in

turn, selling those goods to help finance the Mission as a whole. All thrift store income is used to operate the Mission.

48.    The thrift stores also supply needed clothes to shelter guests, give out vouchers through a gift card program with partnership organizations, and present volunteer and work opportunities to recovery program graduates where they gain valuable job readiness experience to support their entry to the job market.

### 2. Evangelism: The Mission's Christian beliefs require it to spread its Christian teachings and faith.

49.    After His resurrection, Jesus gave his followers the Great Commission: "Go into all the world and proclaim the gospel to the whole creation." *Mark* 16:15 (ESV); *see also Matthew* 28:19–20 (ESV).

50.    The Mission therefore believes it must spread the Gospel of Jesus Christ to shelter guests, the homeless on the streets, shoppers at its thrift stores, volunteers, diners at the Good News Café, visitors to its health clinics, and everyone else in between.

51.    The Mission does so in and through its various programs and services and uses every opportunity to teach others abouts its religious beliefs and faith.

52.    For instance, the central goal in all of its recovery programs is not only to help its guests recover from addiction but also to experience the transformation of a saving relationship with Jesus, bringing forgiveness, purpose, and membership in Christ's church.

53. Last fiscal year, 70 guests made professions of faith in Christ and 16 took the public step of baptism, expressing their faith to the world.

54. The Mission views all of its employees as facilitators of its religious purpose. It thus requires all employees—from the CEO to cooks—to actively practice their faith by being "witnesses to the transforming power of Christ," Ex. 2, p. 61, by treating fellow coworkers with biblical love and encouragement, and by caring for others with a servant's heart as they perform their day-to-day duties at the Mission. *See also* Christian Purposes Acknowledgement, a true and accurate copy attached as **Exhibit 4**.

**3. Discipleship: The Mission's Christian beliefs require it to maintain a community of likeminded believers to help each other grow in their faith and fulfill its purposes.**

55. The Bible also emphasizes Christian fellowship, community, and discipleship.

56. In the Great Commission, Jesus not only told his followers to go and *spread* the Gospel, but also to "*make disciples* of all nations" and to "teach[ ] them to observe all that I have commanded you." *Matthew 28:19–20* (ESV) (emphasis added).

57. In speaking to the church at Corinth, the Apostle Paul wrote: "I appeal to you, brothers, by the name of our Lord Jesus Christ, that all of you agree, and that there be no divisions among you, but that you

be united in the same mind and the same judgment." *I Corinthians* 1:10 (ESV).

58.    In the book of Acts, the newly formed church "devoted themselves to the apostles' teaching and fellowship" and "all who believed were together and had all things in common." *Acts* 2:42, 44 (ESV).

59.    The Christian "church" is not confined to a building or house of worship in the traditional sense of that term, but it extends to other ministries like the Mission who are simply different parts of the larger body—or Church—of Jesus Christ. *See Romans* 12:3–8 (ESV).

60.    For Christian fellowship and discipleship to flourish, the Mission needs to maintain an internal community of likeminded believers (*i.e.,* its staff) who hold the same religious beliefs and abide by the same religious tenets. Otherwise, the Mission's religious purpose and message will be undermined and confused.

61.    The Mission's focus on fellowship, community, and discipleship is exemplified in everything it does. Staff meetings always begin with prayer; team members share devotionals, offer biblical encouragement, and pray for each other; employees lead and attend the recovery program's weekly Friday worship service; and staff frequently give their testimonies in meetings and during worship services.

62.    The shared enactment of Christian community provides a clear example to clients about what it means to live together in constant

fellowship and love. It is thus the means by which client

transformation occurs.

### 4. The Mission holds traditional Christian beliefs on marriage and sexuality.

63.     The Mission believes "God created humans in His image" and "He made humanity expressed in two complementary and immutable sexes, male and female, each displaying features of His nature." Ex. 2, p. 61.

64.     It also believes that "[f]or their joy and well-being, God commanded human sexual expression to be completely contained within the marriage of one man to one woman, equally naming every other expression sinful." Ex. 2, p. 61.

65.     So the Mission believes that sexual immorality—any sexual activity outside the relationship of biblical marriage of one man and one woman, including premarital opposite-sex cohabitation, adultery, and homosexual conduct—is sin. *See Romans* 1:26–28; *see also I Timothy* 1:9–11.

66.     The Mission requires all employees to embrace and follow its beliefs on marriage and sexuality and thus prohibits them from engaging in sexually immoral conduct.

67.     The Mission believes that holding fellow believers accountable is necessary in discipleship, is a way to express the love of Christ to each other, and safeguards the integrity of its Gospel message.

**B. The Mission's employment practices are essential to exercising its faith and fulfilling its calling.**

68. The Mission employs more than 150 employees.

69. Because it is a religious organization, the Mission's employees are its hands and feet who carry out its religious purpose and mission.

70. The Mission requires all employees to be coreligionists—those who agree with and live out the Mission's religious beliefs and practices. *See* Ex. 4 (requiring employees to review, agree, and comply with the Mission's religious beliefs); *see also* Ex. 2.

71. The Mission requires *agreement* and *adherence* to its Christian beliefs, meaning employees must agree in belief (internally) and adhere to a Christian lifestyle and behavior (externally). These behavior standards are set forth in the Statement of Faith and in scripture.

72. The Mission must hire likeminded believers to be of one accord and united in fulfilling its religious purpose. Employing coreligionists:

(a) helps ensure every employee serves the homeless with a Christ-centered mindset as commanded by scripture;

(b) assures every employee is able and willing to effectively share the Gospel with every person at every chance;

(c) ensures every employee evangelizes and communicates a message consistent with the Mission's beliefs and the messages of other employees;

(d) allows the Mission to be a haven of Christian fellowship and community that facilitates discipleship—employees support each other in their Christian journey, provide biblical teaching and encouragement, give lifestyle guidance, and hold each other accountable; and

(e) helps shield employees and guests from being exposed to sinful speech, habits, behaviors, and temptations, which, for instance, is critically important to the Mission's New Life Program participants who usually have struggled with addiction and abuse.

73. Indeed, only hiring coreligionists is central to the credibility of the Mission's Gospel message. If Mission employees, no matter their position, present a mixed or contradictory message about the Gospel of Jesus Christ to the vulnerable people it yearns to reach, the Mission loses credibility and the effectiveness of its evangelization wanes.

74. The Mission is transparent about its requirements for employees.

75. Potential applicants are advised both before applying and throughout the application process that the Mission is a Christian organization and that all employees must agree with and live out the Mission's religious beliefs in their life and work.

76. Candidates must first go to the Mission's application page, which notifies applicants up front of its religious identity, telling

applicants to apply if they "are motivated by love, faith in Christ, and a calling to do the work of helping those in great need in our community." *Employment*, Yakima Union Gospel Mission, https://perma.cc/DQX8-EN6W.

77. Next, every job description notes that the candidate must model and promote the Mission's Christian culture, core values, policies, and procedures; are expected to share the love of Christ with everyone they encounter; and must set a godly example for staff and clients.

78. Then, the Mission's employment application asks candidates about their Christian story (how and why they became a Christian), beliefs about the Bible, and if they attend church. They are also asked to provide a spiritual reference.

79. Finally, the end of the application asks candidates if they agree "without reservation" with the Mission's Statement of Faith.

80. If an applicant is offered a position, he or she must sign and agree to comply with the Mission's Statement of Faith, core values, job description duties and requirements, and the employee handbook. *See* Ex. 4.

81. Every year, the Mission receives applications that profess disagreement with its religious beliefs, and sometimes receives applications that express open hostility or contention with the

1  Mission's religious beliefs, especially its beliefs on marriage and

2  sexuality.

3      82.    To illustrate, recently the Mission received an application for

4  its IT technician position that gave antagonistic responses to the

5  Mission's questions about its beliefs and the Bible:

6  **Q14. The YUGM expects all staff to engage in acts of Christian ministry.  As such, please tell us about how and when you became a Christian, your growth in Christ, and what He means to you.**

7  A14. I am not indoctrinated.

8  **Q15. What do you believe about the Trinity as it relates to the Father, Son, and Holy Spirit?**

9  A15. I do not follow the indoctrination of religion.

10  **Q16. What do you believe about the Bible?**
**For example:  It's the unchanging truth for all people, or it's a record of religion from a certain time and culture, or state in your own words what you believe about the Bible.**

11  A16. Bible is false.

12  **Q17. What do you believe the Bible says about homosexuality and how the Bible defines/views gender identity?**

13  A17. I believe the Bible teaches harmful views against the LGBTQ+.

14  **Q18. Do you agree or disagree with what the Bible says about homosexuality and gender identity?**

15  A18. Bible is teaching harmful information about the LGBTQ+ community.

16      * * *

17

18  **Q33. Please explain if there are any portions of our Statement of Faith that differ from your own beliefs.**

19  A33. Your company just violated my personal beliefs and using the bible to teach good morals is false.

20      83.    The Mission categorically screens out all such applicants—and

21  did so with the applicant referenced above—who do not agree with or

22  are not willing to abide by the Mission's religious beliefs and behavior

23  requirements. Only coreligionists advance in the interviewing process.

84.    This application process enables the Mission to vet potential employees to ensure they hold and will live out the same Christian beliefs so that the Mission can advance its religious ministry.

85.    The Mission will not employ people who fail to agree with or live out its religious beliefs and practices.

## II.    The Washington Law Against Discrimination

### A.    The WLAD's prohibitions and enforcement mechanisms.

86.    The WLAD declares it a Washington state "civil right" to be "free from discrimination because of . . . sexual orientation." Wash. Rev. Code Ann. § 49.60.030(1).

87.    Relevant here, the WLAD prohibits employers from refusing to hire, discharging, barring from employment, or otherwise discriminating against a person in the compensation or other terms or conditions of employment "because of . . . sexual orientation" (the "employment provision"). *Id.* § 49.60.180(1), (2), (3).

88.    Similarly, the WLAD prohibits an employer from "print[ing], or circulat[ing], or caus[ing] to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to . . . sexual orientation" (the "publication provision"). *Id.* § 49.60.180(4).

89.     The WLAD also prevents an employer from "[r]equir[ing] an employee to disclose his or her sincerely held religious affiliation or beliefs, unless the disclosure is for the purpose of providing a religious accommodation at the request of the employee" (the "disclosure provision"). *Id.* § 49.60.208(1).

90.     "Sexual orientation" is defined in the WLAD as "heterosexuality, homosexuality, bisexuality, and gender expression or identity." *Id.* § 49.60.040(27).

91.     In effect, the employment provision prohibits an employer—like the Mission—from making any employment decision that considers an employee's (or prospective employee's) sexual orientation. The publication provision prohibits an employer from notifying the public about employment criteria that may be perceived as limiting employment based on sexual orientation. And the disclosure provision prohibits an employer from asking applicants about their religious beliefs at all.

92.     The WLAD completely exempts employers with seven or fewer employees and, before *Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231 (2021), *cert. denied,* 142 S. Ct. 1094 (2022), completely exempted nonprofit religious and sectarian organizations. *Id.* § 49.60.040(11).

93.     Defendant Ferguson enforces the WLAD pursuant to § 43.10.030. *Accord Washington v. Matheson Flight Extenders, Inc.,* No.

C17-1925-JCC, 2021 WL 489090, at *3 (W.D. Wash. Feb. 10, 2021) ("the Attorney General is authorized to enforce [the] WLAD").

94. In fact, Defendant Ferguson's office routinely files civil actions to enforce the WLAD. *E.g.*, *Cases*, Washington State Office of the Attorney General, https://perma.cc/47T5-4SQT (listing multiple WLAD cases filed by the Attorney General).

95. The Commission also has broad statutory authority to enforce the WLAD. Wash. Rev. Code Ann. § 49.60.120.

96. The Commission investigates alleged WLAD violations and "has power to hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath, and in connection therewith, to require the production for examination of any books or papers relating to any matter under investigation or in question before the commission." *Id.* § 49.60.140.

97. "Any person claiming to be aggrieved" by a violation of the WLAD may file a complaint with the Commission, and the Commission itself can issue a complaint if it believes an employer is violating the WLAD. *Id.* § 49.60.230.

98. The Commission can ask a state court to enforce compliance with its investigations, and failure to comply with a Commission investigation is punishable by contempt of court. *Id.* § 49.60.160.

99. Any person who willfully flouts a Commission investigation or violates an order of the Commission can also be charged criminally. *Id.* § 49.60.310.

100. If the Commission's investigation concludes there is reasonable cause to believe a violation of the WLAD occurred, but it cannot achieve conciliation, it must prosecute the complaint in an administrative hearing. *Id.* § 49.60.250.

101. Defendant Ferguson's office represents the Commission in these administrative hearings. *See Cases*, Washington State Office of the Attorney General, https://perma.cc/47T5-4SQT (listing "Enforcement Actions on Behalf of Washington State Human Rights Commission (WSHRC)").

102. If an administrative law judge determines that an employer engaged in an unfair practice in violation of the WLAD, he must order the employer to "cease and desist from such unfair practice" and can order an employer to hire, reinstate, or upgrade an employee; to pay backpay; to report its compliance with the order; and to take any "other action" that "will effectuate the purposes" of the WLAD. Wash. Rev. Code Ann. § 49.60.250(5).

103. The Commission, and any person entitled to relief under an administrative judge's order, may sue an employer in state court to enforce the administrative law judge's order. *Id.* § 49.60.260(1).

104. And the WLAD provides a private right of action against an employer for alleged violations. *Id.* § 49.60.030(2).

105. In sum, an employer who is merely *alleged* to have violated the WLAD can face myriad enforcement mechanisms including private lawsuits; long and burdensome Commission investigations backed by contempt and criminal prosecution; attorney general investigations; and compulsory administrative law proceedings. If an employer is found to have violated the WLAD, it can face orders forcing hiring, reinstatement, payment of backpay and damages, and other affirmative action; Commission enforcement lawsuits; and even lawsuits brought by the Washington Attorney General.

**B. The Washington State Legislature decided to exempt nonprofit religious organizations.**

106. Since its inception in 1949, the WLAD exempted religious nonprofit organizations.

107. The WLAD completely exempts religious nonprofit organizations by excluding them from the definition of "employer." *Id.* § 49.60.040(11) ("'Employer' . . . does not include any religious or sectarian organization not organized for private profit.").

108. The Washington Legislature enacted the religious employer exemption because it recognized the "potential entanglements between the state and religion that could occur in enforcing WLAD against

religious nonprofits." *Ockletree v. Franciscan Health Sys.*, 179 Wash. 2d 769, 785 (2014).

109.   The Legislature thus "reasonably conclude[d] that religious organizations should be relieved of the burden of predicting when their religious beliefs would be regarded as sufficient justification for an employment decision." *Id.* at 785–86.

### C.   Recently, the Washington Supreme Court unilaterally narrowed the religious employer exemption.

110.   In March 2021, the Washington Supreme Court decided *Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231 (2021), *cert. denied,* 142 S. Ct. 1094 (2022), holding that the WLAD's religious employer exemption does not apply to claims of sexual orientation discrimination under the WLAD, unless the claims are brought by an employee that meets the "ministerial exception" as defined by the United States Supreme Court. *Woods*, 197 Wash. 2d at 241–52.

111.   To reach that holding, the Washington Supreme Court conducted a state constitutional analysis under the Washington Constitution's privileges and immunities clause (Wash. Const. art. I, sec. 12), finding "the right to an individual's sexual orientation and the right to marry," *id.* at 242, are "fundamental rights of state citizenship," *id.* at 246.

112.   The court then held that the religious employer exemption would "be unconstitutional as-applied" to people claiming sexual

orientation discrimination, unless the exemption was limited to the "ministerial exception." *Id.*

113.  Justice Yu concurred and labeled religious organizations' religiously-based employment decisions as a "license to discriminate." *Id.* at 253–54 (Yu, J., concurring). She also said it was her "greatest hope" that religious organizations would voluntarily choose to limit their use of the ministerial exception—a constitutionally protected right. *Id.* at 254.

114.  Put simply, "the Washington Supreme Court's reasoning [in *Woods*] presumes that the guarantee of church autonomy in the [U.S.] Constitution's Religion Clauses protects only a religious organization's employment decisions regarding formal ministers," when the U.S. Supreme Court's "precedents suggest that the guarantee of church autonomy is not so narrowly confined." *Seattle's Union Gospel Mission*, 142 S. Ct. at 1096 (Statement of Alito, J., respecting the denial of certiorari).

115.  Following the United States Supreme Court's denial of certiorari and the case's remand back to the trial court, the plaintiff voluntarily dismissed the lawsuit against Seattle's Union Gospel Mission. *See* Order of Dismissal Without Prejudice, *Woods v. Seattle's Union Gospel Mission*, Case No. 17-2-29832-8 (King County Superior Court Aug. 30, 2022).

### D. Defendant Ferguson enforces the WLAD's prohibition on sexual orientation discrimination against religious organizations.

116.  Confirming the Washington Supreme Court's rewriting of the religious employer exemption, Defendant Ferguson has doubled down on the view that religious nonprofit organizations are not protected from the WLAD's sexual orientation provisions for their non-ministerial employees and has enforced the law as such.

117.  Roughly 14 months after *Woods*, a local Christian university reevaluated and decided to retain its policy that employees must refrain from unbiblical sexual behavior. *See SPU Board of Trustees Reaches Decision on Employee Lifestyle Expectations*, Seattle Pacific University (May 23, 2022), https://perma.cc/GVP9-NZZ8.

118.  In response, multiple complaints were lodged against the university, claiming that the policy discriminated against employees based on sexual orientation. *See Attorney General Ferguson Confirms Civil Rights Investigation of Seattle Pacific University*, Office of the Attorney General (July 29, 2022), https://perma.cc/37NP-5Q72.

119.  Rather than honor the Christian university's federal constitutional right to hire employees who share the university's faith, Defendant Ferguson began to investigate the university for violating the WLAD because of the university's policies that potentially "discriminat[e] on the basis of sexual orientation, including by prohibiting same-sex marriage and activity." Attorney General's June

8, 2022, Letter to Seattle Pacific University, a true and accurate copy attached as **Exhibit 5**.

120. Defendant Ferguson's letter to the university did not mention the religious employer exemption. *See generally id.*

121. Defendant Ferguson turned the State's investigation into a public crusade, encouraging people to file complaints with his civil rights team if they believed the university discriminated against them. *See Attorney General Ferguson Confirms Civil Rights Investigation of Seattle Pacific University, supra* ¶ 118.

122. The university sued Defendant Ferguson to stop the investigation. *See Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. filed July 27, 2022).

123. During the litigation, Defendant Ferguson removed any doubt about the State's enforcement position, confirming repeatedly that the State will enforce the *Woods* court's reinterpretation of the WLAD—*i.e.,* that religious organizations are no longer protected from sexual orientation discrimination claims for non-ministerial employees.

124. Specifically, in moving to dismiss the university's complaint, Defendant Ferguson stated on behalf of the State:

- "And while the First Amendment clearly protects the University's employment practices with respect to its ministers, *those protections do not extend to discrimination against the University's non-ministerial employees, to whom the WLAD's*

*prohibition of employment discrimination on the basis of sexual orientation would apply.*" Motion to Dismiss at 17, *Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) (emphasis added).[1]

- "The fact that the University's complaint, after amendment, does not allege that all of its employees are ministers strongly suggests *that at least some of its employment decisions are subject to Washington law.*" *Id.* at 19 (emphasis added).

- "Thus, while SPU's employment practices with respect to ministers are clearly protected under the First Amendment, *its employment practices with respect to non-ministers—which is what the AGO's inquiry focused on—are different.*" *Id.* at 13 (emphasis added).

- "The Washington Supreme Court subsequently held that the religious-employer exception under the WLAD *has the same contours as the federal ministerial exception. Woods*, 481 P.3d at 1070." Id. at 9 (emphasis added).

---

[1] Defendant Ferguson's proposition that the First Amendment's employment protections stop at a religious organization's ministerial employees is wrong. *See infra* "First Claim for Relief." His various public comments merely evidence his active enforcement of the WLAD against religious organizations.

- "The AGO's letter [to the University] made clear it was trying to determine which positions are ministerial and which are not. There is nothing to 'limit' until these categories of employees have been sorted out." Reply in Support of Motion to Dismiss, *Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) (internal citation omitted).

125. The Western District of Washington dismissed the university's case. It is now pending appeal at the Ninth Circuit.

## III. The WLAD's Effect on The Mission

### A. The WLAD requires the Mission to employ people who do not share or live out its religious beliefs and practices.

126. *Woods*' judicially rewritten religious employer exemption no longer protects the Mission—and other religious organizations—from sexual orientation discrimination claims brought by non-ministerial employees/prospective employees.

127. Under *Woods'* reasoning and Defendants' current enforcement of the WLAD, the Mission is only exempt under the WLAD from sexual orientation discrimination claims brought by ministerial employees (as legally defined).

128. But the Mission employs non-ministerial employees in addition to "ministers."

129. As described above, *supra* § I.A., non-ministerial employees are still essential to the Mission's religious acts of service, evangelism, discipleship, community, and overarching religious goals.

130. Based on previous years, the Mission anticipates hiring more than 50 employees in 2023, including both ministerial and non-ministerial employees.

131. For instance, the Mission currently has openings for an IT technician and operations assistant. *See* Yakima Union Gospel Mission IT Technician and Operations Assistant Job Descriptions, true and accurate copies attached as **Exhibits 6** and **7**, respectively.

132. The IT technician is "the first point of contact when an issue arises from end users" and "ensures employees['] IT needs are met." Ex. 6, p. 76. Some of the IT technician's direct duties include configuring and troubleshooting endpoint devices like computers, printers, cameras, phones, and registers; offering expertise to other employees on hardware and software; running and terminating voltage cable; and creating keycards and operating the access control system. *See* Ex. 6, p. 77.

133. The operations assistant is "[r]esponsible for assisting the Director of Operations in all aspects of Operations activities." Ex. 7, p. 81. The operations assistants' direct duties include assisting in the preparation of monthly activity reports; running errands and acquiring

supplies as needed; performing administrative aspects; and helping to keep operations projects updated and on track. *See* Ex. 7, p. 82.

134.   In addition to their hands-on duties, and as with all Mission employees, both of these positions are expected to exhibit and live out Christian values, for example, by sharing the Gospel, praying with and for others, and being an example in word and deed to coworkers.

135.   Namely, both positions are expected to "[i]mprove the reputation of Christ by personal interactions with others" and to "[s]et a godly example for staff and clients." Ex. 6, p. 76; Ex. 7, p. 81.

136.   Being exposed to fellow believers in and through work are the very reason many employees decide to take a job at the Mission.

137.   There are myriad ways in which people working in a community of likeminded believers are required to further the overarching mission. From something as simple as everyday watercooler conversations of, for example, what they did the night before, what activities they are involved in, concerts they have attended, or even the Church sermon the previous Sunday. Each conversation should be consistent with scriptural mandates.

138.   The IT technician assists every employee with technology and hardware issues. His or her speech, attitude, demeanor, and actions should all be a Christ-like example and are important to the operation of the Mission each day. He or she is expected to be an internal living testimony of the Mission's work and calling.

139.  The operations assistant position would also interact with many employees and outside people on a daily basis. He or she would often be the first person someone speaks to or interacts with. So he or she is expected to be Christ-like in his or her dealings with others, no matter the issue.

140.  Both positions should be able to offer scriptural encouragement, prayer, or whatever is needed at the moment. They are to reflect biblical speech, a holy attitude, and an ever-growing knowledge of scripture.

141.  But the IT technician and operations assistant are not considered clergy, and both are primarily tasked with job duties of an "inward" nature—*i.e.,* they mostly interact with fellow employees and only at times interact with shelter guests, program attendees, and members of the public.

142.  As such, while these positions are an essential part of the Mission's culture and Christian community, they are not "ministerial" employees protected by the legal ministerial exception. *See Woods,* 197 Wash. 2d 241–52 (limiting the WLAD's religious employer exemption to the ministerial exception).

143.  As stated above, *supra* § I.B., the Mission requires all employees, ministerial or not, to agree with and adhere to its Christian beliefs and behavior standards. This includes refraining from sexual conduct that violates biblical teaching.

144.  But because the IT technician and operations assistant are not "ministerial employees," the Mission's religious behavior requirements for those positions now subjects the Mission to investigation and litigation brought by the Attorney General and the Commission on behalf of the State claiming a violation of the WLAD.

145.  As a result, the WLAD interferes with the Mission's religiously-based internal management decisions. Specifically:

(a) the employment provision prohibits the Mission from refusing to hire a person to fill, for example, its IT technician or operations assistant positions if that person disagrees with or is violating the Mission's behavior standards on homosexual conduct;

(b) the publication provision prohibits the Mission from publishing a notice or employment application for non-ministerial employees that states they must agree with and follow the Mission's behavior standards on homosexual conduct;

(c) the disclosure provision prohibits the Mission from asking a non-ministerial employee to disclose his or her sincerely held religious beliefs about sexual behavior, including homosexual conduct.

146.  In effect, the recent reinterpretation and enforcement of the WLAD forces the Mission to employ people who are not coreligionists: those who do not share, and who behave in ways antithetical to, its Christian beliefs and Gospel message.

147. The end result of the WLAD's forced inclusion of nonbelievers is the Mission can no longer self-define its internal Christian community, which undermines its ability to be an example of and propagate its Christian teachings and ideals, obstructs discipleship and internal spiritual growth, and threatens all aspects of its overtly religious goals.

**B. The Mission faces ongoing and imminent harm for continuing its faith-based hiring practices.**

148. Because of *Woods'* decimation of the religious employer exemption, and Defendants' current enforcement of the WLAD, the Mission faces both ongoing and imminent irreparable harm for following its religiously-based hiring practices.

149. The Mission previously advertised its open job positions on the online hiring platform, *Indeed.com*, aside from posting on its own website.

150. After Defendant Ferguson began investigating Seattle Pacific University for its religious hiring requirements, *supra* § II.D., *Newsweek* published an article on the Mission's religious hiring practices after an applicant posted the Mission's application questions about religious beliefs on *Reddit.com*. *See* Shira Li Bartov, *Strange Thrift Store Application Asks About Beliefs on Bible, Homosexuality*, Newsweek (Aug. 31, 2022), https://perma.cc/WG2A-XGBE.

151.  The *Reddit* thread that prompted the *Newsweek* article received significant attention. To date, the *Reddit* thread has received over 1,600 comments.

152.  The majority of those *Reddit* comments show pervasive and offensive hostility to the Mission's beliefs and hiring practices.

153.  One commenter said he or she would "have the Church of Satan help [him or her] answer [the questions]." And another said that it was "illegal to not hire me based on religion."

154.  Thousands of other comments paint a similar picture. Multiple commenters even asked for the application link so they could "apply," presumably to file a discrimination complaint once turned down for not agreeing to abide by the Mission's religious beliefs.

155.  The Mission's application process caught other media attention, too. *See, e.g., Thrift Store Job Application Asks 'What Do You Believe About the Bible?'*, THE DAILY DOT, (Aug. 31, 2022), https://perma.cc/27YU-W9Q7.

156.  Days after the *Newsweek* article was published, the Mission received an anonymous voicemail telling the Mission it was "illegal" to ask about religious beliefs pertaining to homosexuality. The message also relayed a veiled threat, "suggest[ing]" the Mission "stop" its religious belief inquiries because the caller "would hate to see something happen to some of your thrift stores."

157.  Because of this, the Mission feared it would be investigated for its coreligionist hiring and that it would incur substantial liability under the WLAD for its practices.

158.  So the Mission decided to stop using *Indeed.com* to reduce the number of disagreeable applications and to lessen the risk of enforcement and punishment under the WLAD.

159.  This in turn caused a drastic drop in the number of overall applications the Mission receives, making it harder to fill positions. For example, in the five weeks before it stopped using *Indeed.com*, the Mission averaged 26 applications per week; in the five weeks after, just five per week.

160.  The Mission also removed its IT technician position from its employment opportunities webpage and refrained from posting its operations assistant position (which recently became available) because they are not protected by the ministerial exception and Defendants will enforce the WLAD against the Mission with respect to those positions.

161.  Moreover, the WLAD's publication provision has chilled the Mission's speech. The Mission has adopted a Religious Hiring Statement that it intends to publish on its employment opportunities webpage. The statement expresses a requirement that *all employees* must agree with and live out the Mission's religious beliefs, including

those beliefs which conflict with the WLAD's prohibition on sexual orientation discrimination:

> Yakima Union Gospel Mission (YUGM) is a Christian ministry that serves the community in accordance with Christian doctrine, spreads the Gospel of Jesus Christ, and helps fellow believers grow in their faith. Because Yakima Union Gospel Mission seeks to collectively share its religious ideals, it can only hire employees (who are its hands and feet and its messengers) who agree with, adhere to, and live out the Mission's religious beliefs and practices. This includes the Mission's religious beliefs on biblical marriage and sexuality, as set forth in its Statement of Faith.

Yakima Union Gospel Mission, Religious Hiring Statement, a true and accurate copy attached as **Exhibit 8**.

162. Yet the Mission has refrained from posting its Religious Hiring Statement on its website because the WLAD's publication provision prohibits the posting of statements in connection with prospective employment that notes a limitation or specification about sexual orientation.

163. The Mission intends to and would resume using *Indeed.com*, would publish its Religious Hiring Statement, and would continue hiring only coreligionists for its IT technician, operations assistant, and other non-ministerial positions but for the WLAD and Defendants' enforcement of the WLAD.

164. The Mission is thus suffering ongoing harm because it is unable to fully advertise its positions and is forced to self-censor,

modify its behavior, and chill its speech to avoid punishment under the WLAD.

165.   And the Mission faces multiple forms of imminent punishment and liability for violating the WLAD, including: lawsuits brought by private parties, Defendant Ferguson, or the Commission; long and burdensome Commission and Attorney General investigations backed by contempt and criminal prosecution; forced participation in administrative law proceedings; and orders forcing hiring, reinstatement, payment of backpay and damages, and other affirmative action.

166.   Because the Washington Supreme Court effectively abolished the WLAD's statutory religious employer exemption for sexual orientation discrimination claims outside the ministerial context, the Mission needs judicial relief that declares it has a *federal constitutional right* to hire coreligionists for its non-ministerial positions, including for its IT technician and operations assistant positions.

167.   The Mission also needs judicial relief to protect its ability to exercise religion; to express its collective, faith-based message; to speak about its religious hiring requirements on its website; and to govern its internal affairs free from governmental entanglement.

168.   Without judicial relief, the Mission will continue to face the following irrational, impossible, and illegal choice: (a) continue to hire only coreligionists for its non-ministerial positions to further its

spiritual calling but face punishment and liability under the WLAD, or (b) abandon its religious purpose and mission and begin hiring nonbelievers to avoid penalties under the WLAD.

169.  This Hobson's choice between fundamental rights and avoiding civil and criminal liability irreparably harms the Mission.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE FIRST AMENDMENT'S RELIGION CLAUSES:**
**CORELIGIONIST EXEMPTION**

170.  The Mission incorporates by reference paragraphs 1–169.

171.  The Mission is a religious organization under the First Amendment.

172.  Both Religion Clauses of the First Amendment protect the Mission's "power to decide for [itself], free from state interference, matters of [internal] government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

173.  This fundamental right to religious autonomy goes beyond protecting the Mission's mere selection of ministers or clergy; it also safeguards the Mission's decisions about other internal management and employment matters. *See, e.g.*, *Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 656 (10th Cir. 2002).

174.  The First Amendment protects the Mission's freedom to make internal management and employment decisions in order to "define

and carry out [its] religious mission[ ]" without fear of liability under employment laws, such as the WLAD. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 335–36 (1987).

175.   Rooted in the fundamental right to religious autonomy is the coreligionist exemption: the Mission's right to select employees according to religious principles free from government interference and without facing liability under employment laws.

176.   The Mission thus has a constitutional right to employ only coreligionists—individuals who agree with its religious beliefs and who will adhere to its religious tenets and behavior requirements—for both ministerial *and* non-ministerial positions. *Accord Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting denial of certiorari) ("To force religious organizations to hire messengers and other personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability.").

177.   As enacted by the Washington legislature, the WLAD's religious employer exemption protected the Mission's right to employ coreligionists for its non-ministerial positions.

178.   Indeed, the legislature enacted the religious employer exemption "to avoid potential entanglements between the state and religion that could occur in enforcing WLAD against religious

nonprofits." *Ockletree v. Franciscan Health Sys.*, 179 Wash. 2d 769, 785 (2014).

179. The religious employer exemption thus codified the constitutional right to religious autonomy protected by the Free Exercise and Establishment Clauses.

180. Due to *Woods*, that statutory exemption has been reduced to the ministerial exception.

181. The Mission therefore faces investigations and penalties under the WLAD for hiring coreligionists for its non-ministerial positions, including for its open IT technician and operations assistant positions.

182. The recent cabined interpretation of the WLAD, and Defendants' enforcement of the WLAD, violates the First Amendment's coreligionist exemption as applied to the Mission and other religious organizations with similar religious beliefs and hiring practices.

183. Defendants also violate the Religion Clauses to the extent that they enforce the WLAD by parsing religious organizations' employees position-by-position to determine whether certain positions are protected by the ministerial exception or subject to the WLAD's sexual orientation provisions—as Defendant Ferguson sought to do in his investigation into Seattle Pacific University, who has similar Christian behavior requirements. *See Amos*, 483 U.S. at 336 ("Nonetheless, it is a significant burden on a religious organization to require it, on pain of

substantial liability, to predict which of its activities a secular court will consider religious.").

184.   The Mission is, and will continue to be, irreparably harmed if it cannot exercise its constitutional right to employ coreligionists.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF THE FREE EXERCISE CLAUSE: NOT NEUTRAL OR GENERALLY APPLICABLE

185.   The Mission incorporates by reference paragraphs 1–169.

186.   The Mission's religious beliefs compel it to engage in acts of service by caring for the homeless, the addicted, the poor, and the hungry; to preach and spread the Gospel of Jesus Christ at every opportunity; and to disciple and partake in fellowship with other Christian believers.

187.   The Mission exercises its religion through all of its programs and services and by sharing its beliefs with all of its employees, those the Mission serves, and the public.

188.   The Mission also exercises its religion through its selection of employees, which ensures the Mission furthers its religious purpose and goals.

189.   The recent cabined interpretation of the WLAD, and Defendants' enforcement of the WLAD, substantially burdens the Mission's religious exercise by forcing it to decide between adhering to its religious beliefs or complying with state employment law to avoid substantial civil and criminal penalties.

190.  The WLAD is not neutral and generally applicable and triggers strict scrutiny because it exempts entirely small employers—those with fewer than eight employees—but only gives religious nonprofit employers like the Mission a partial exemption for its ministerial hires.

191.  The WLAD is not neutral and generally applicable and triggers strict scrutiny because it contains additional categorical exemptions. For example, the WLAD exempts distinctly private institutes, clubs, and places of accommodation, including fraternal organizations; and public and private educational institutions are permitted to separate or give preference based on sex in their use of dormitories, residence halls, and other housing.

192.  The WLAD is not neutral and generally applicable and triggers strict scrutiny because it contains a mechanism for individualized exemptions, whereas the Commission has discretion to exempt an employer by regulation or ruling for an employment decision based on sex on a case-by-case basis.

193.  The WLAD is not neutral and generally applicable because the Washington Supreme Court single-handedly terminated the religious employer exemption overnight knowing it would interfere with religious organizations' autonomy.

194.  And Defendants' enforcement of the WLAD is not neutral and generally applicable because Defendant Ferguson has specifically

targeted, investigated, and encouraged the public to file complaints against at least one religious employer that has similar beliefs and hiring practices on marriage and sexuality as the Mission.

195. The decision in *Woods*, and Defendants' conduct, creates at least a slight suspicion of animosity toward the Mission's religious beliefs, thus triggering strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547 (1993).

196. The decision in *Woods*, and Defendants' conduct, also shows hostility toward the Mission's religious beliefs, which is a per se violation of the Free Exercise Clause. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719 (2018).

197. The WLAD, and Defendants' enforcement of the WLAD, does not serve any compelling governmental interests.

198. The WLAD, and Defendants' enforcement of the WLAD, is not narrowly tailored to achieve any purported compelling governmental interest.

199. The WLAD, and Defendants' enforcement of the WLAD, fails strict scrutiny and violates the Free Exercise Clause as applied to the Mission and other religious organizations with similar religious beliefs and hiring practices.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE FIRST AMENDMENT: EXPRESSIVE ASSOCIATION

200. The Mission incorporates by reference paragraphs 1–169.

201. The First Amendment protects the right of people "to associate with others in pursuit of . . . religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000).

202. When an association expresses a collective message, the First Amendment prohibits the government from forcing the association to admit those who disagree with its message, seek to change that message, or express a contrary view.

203. The Mission is an expressive association because its "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring).

204. And "there can be no doubt that the messenger matters" in that religious expression. *Id.* at 201.

205. Everyone the Mission employs is expected to and does express its religious message.

206. So the Mission employs only likeminded believers in order to fulfill its religious purpose and to *express its religious beliefs* to fellow employees, those the Mission serves, and the public.

207. The WLAD, and Defendants' enforcement of the WLAD, forces the Mission to expressively associate with people that do not hold the same religious views and who, therefore, cannot express the same message.

208. The forced inclusion of a person who does not agree with the Mission's religious views erodes its ability to credibly express its message.

209. Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the Mission's freedom of expressive association.

210. The WLAD, and Defendants' enforcement of the WLAD, violates the First Amendment's right to expressive association as applied to the Mission and other religious organizations with similar religious beliefs and hiring practices.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE FREE SPEECH CLAUSE: CONTENT / VIEWPOINT DISCRIMINATION

211. The Mission incorporates by reference paragraphs 1–169.

212. The First Amendment's Free Speech Clause protects the Mission's ability to speak, to create, to publish, and to distribute speech about its religious beliefs and behavior requirements.

213. The Mission's Statement of Faith, Christian Purposes Acknowledgement form, employment application, job postings, and Religious Hiring Statement communicate with prospective employees about its religious beliefs and behavior requirements.

214. The WLAD's publication provision, Wash. Rev. Code Ann. § 49.60.180(4), restricts and chills the Mission's speech by preventing it from communicating to prospective employees its religious beliefs and

behavior requirements on marriage and sexuality, namely its Religious Hiring Statement.

215. And the WLAD's disclosure provision, Wash. Rev. Code Ann. § 49.60.208, restricts and chills the Mission's speech by preventing it from inquiring about prospective employees' religious beliefs on marriage and sexuality.

216. Both provisions are content and viewpoint-based limitations on speech.

217. The provisions discriminate based on content and viewpoint by allowing an employer to publicize positions that welcome those who reject the Mission's religious beliefs about marriage and human sexuality, but they prohibit the Mission from publicizing positions with reference to its Statement of Faith, Christian Purposes Acknowledgement form, and Religious Hiring Statement.

218. Because of the threat of liability under the WLAD, the Mission has stopped advertising on *Indeed.com*, withheld publishing its Religious Hiring Statement, removed its open IT technician position, and refrained from posting its operations assistant position—all of which express the Mission's religious message.

219. The WLAD has thus chilled the Mission's speech.

220. Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing and chilling the Mission's speech.

221. The WLAD, and Defendants' enforcement of the WLAD, violates the Free Speech Clause as applied to the Mission and other religious organizations that communicate similar religious beliefs and hiring requirements.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE ESTABLISHMENT CLAUSE: EXCESSIVE ENTANGLEMENT

222. The Mission incorporates by reference paragraphs 1–169.

223. The Establishment Clause of the First Amendment "complement[s]" the Free Exercise Clause, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022), and protects religious organizations from "state interference [on] matters of [internal] government," *Kedroff*, 344 U.S. at 116.

224. Accordingly, the Establishment Clause prohibits the government from excessively entangling itself with religion by interfering with religious organizations' internal employment decisions.

225. The judicially re-written WLAD and Defendants' enforcement of the WLAD deprives the Mission and other religious organizations of the freedom from "state interference" and forces them to hire employees who do not adhere to the same religious beliefs—including those who may hold hostile and contradictory religious views.

226. The Establishment Clause of the First Amendment also prohibits the government from disapproving of or showing hostility toward a particular religion or religion in general.

227. In the wake of *Woods*, Defendants have enforced the WLAD against organizations that adhere to traditional Christian views on sexuality and marriage.

228. And Defendants also violate the Establishment Clause to the extent that they enforce the WLAD by parsing religious organizations' employees position-by-position to determine whether certain positions are protected by the ministerial exception or subject to the WLAD's sexual orientation provisions.

229. Defendants' enforcement of the WLAD thus violates the Establishment Clause by causing excessive government entanglement with the Mission's employment decisions and by preferring other religions and denominations that hold views different from traditional Christian views on sexuality and marriage.

## Prayer for Relief

WHEREFORE, Union Gospel Mission of Yakima, Wash. requests that this Court enter judgment against Defendants, and order the following relief:

A. Declare that the recent narrowed interpretation of the WLAD, and Defendants' enforcement of the WLAD, violates the Mission's First Amendment rights to:

a. Prefer and hire only coreligionists—those who agree with its religious beliefs and who will adhere to its religious tenets and behavior requirements—for its non-

ministerial positions, including for its IT technician and operations assistant positions;

b. free exercise of religion;

c. expressive association;

d. free speech; and

e. be free from excessive governmental entanglement.

B. Enter a preliminary and permanent injunction, enjoining Defendants from enforcing (including through investigations) the WLAD against the Mission (and other religious organizations with similar religious beliefs and hiring practices) for engaging in its constitutionally protected activities, including: (a) its right to prefer employing coreligionists, (b) its right to religious exercise, (c) its right to associate for expressive purposes, (d) its right to communicate its beliefs and behavior requirements to others, including by publishing its Religious Hiring Statement, and (e) its right to be free from excessive governmental entanglement.

C. Costs and Attorney's fees.

D. Grant any other relief this Court deems equitable, just, and proper.

E. Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Respectfully submitted this 2nd day of March 2023,

s/ _Katherine Anderson_
Katherine Anderson
WA Bar No. 41707
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

_Counsel for Plaintiff_

\* Pending Admission _Pro Hac Vice_

## DECLARATION UNDER PENALTY OF PERJURY

I, James Johnson, a citizen of the United States and a resident of the State of Washington, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this _21_ day of _Feb_, 2023, at _Yakima_, _WA_.

_(signature)_

James Johnson, Chief Executive Officer of the Union Gospel Mission of Yakima, Wash.