Katherine Anderson
WA Bar No. 41707
AZ Bar No. 29490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

\* Admitted *Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **UNION GOSPEL MISSION OF YAKIMA, WASH.**,<br><br>    *Plaintiff,*<br><br> v.<br><br>**ROBERT FERGUSON, ET AL.**,<br><br>    *Defendants.* | Civil Case No.: 1:23-cv-03027<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>MAY 31, 2023 AT 9:00 A.M. WITH ORAL ARGUMENT |

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................. iii

Introduction .........................................................................................1

Facts   ................................................................................................ 3

  A.   Union Gospel Mission of Yakima, Wash. ....................................3

    1.   The Mission is a Christian ministry. ......................................3

    2.   The Mission follows its Christian beliefs on marriage and sexuality. .......3

    3.   The Mission's religious hiring criteria advances its purpose. ...................4

  B.   The Washington Law Against Discrimination. ..............................5

    1.   The WLAD now applies to religious organizations. ................................5

    2.   The State has already enforced the WLAD against a Christian university with similar beliefs. ...............................................6

  C.   The WLAD interferes with the Mission's internal employment decisions and threatens penalties. ..........................................6

Legal Standard ......................................................................................8

Argument.............................................................................................8

  I.   The Mission is likely to succeed on the merits of its claims. .......................8

    A.   Enforcement of the WLAD infringes the Mission's First Amendment right to hire only coreligionists. ...............................................8

      1. Both Religion Clauses require the coreligionist exemption ...................9

      2. The WLAD violates the coreligionist exemption ................................12

    B.   The WLAD is not neutral and generally applicable and violates the Free Exercise Clause. .........................................................13

C.  The WLAD violates the Mission's right to expressive association. ........15

D.  The WLAD violates the Free Speech Clause. ...........................................16

    1. The publication provision limits speech based on
    viewpoint ................................................................................17

    2. The disclosure provision shuts off an entire category of speech ........17

E.  The WLAD fails strict scrutiny. ............................................................18

II.  The other preliminary injunction factors weigh heavily in favor of granting
    injunctive relief. ........................................................................................20

Conclusion ........................................................................................................20

Certificate of Service ........................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*American Beverage Association v. City & County. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) ...............................................................8, 20

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ................................................... 15, 16, 18, 19

*Bryce v. Episcopal Church in the Diocese of Colorado,*
    289 F.3d 648 (10th Cir. 2002) ................................................... 11, 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................... 13, 14, 19

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...............................................................18

*Corp. of Presiding Bishop of*
    *Church of Jesus Christ of Latter-day Saints v. Amos,*
    483 U.S. 327 (1987) ...............................................................10

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...............................................................20

*EEOC  v. Townley Engineering & Manufacturing. Co.,*
    859 F.2d 610 (9th Cir. 1988) ...............................................................10

*EEOC v. Mississippi College,*
    626 F.2d 477 (5th Cir. 1980) ...............................................................11

*Fulton v. City of Philadelphia, Pennsylvania,*
    141 S. Ct. 1868 (2021) ................................................... 13, 14, 18, 19

*Hall v. Baptist Memorial Health Care Corp.,*
    215 F.3d 618 (6th Cir. 2000) ...............................................................11

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*
    *in North America,*
    344 U.S. 94 (1952) ...............................................................2, 8

*Killinger v. Samford University,*
    113 F.3d 196 (11th Cir. 1997) ...............................................................11

*Little v. Wuerl,*
   929 F.2d 944 (3d Cir. 1991) ...........................................................................11

*National Labor Relations Board  v. Catholic Bishop of Chicago,*
   440 U.S. 490 (1979) ...........................................................................10

*New York v. Cathedral Academy,*
   434 U.S. 125 (1977) ...........................................................................10

*Ockletree v. Franciscan Health System,*
   179 Wash. 2d 769 (2014) ...........................................................................5

*Our Lady of Guadalupe School v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020)...........................................................................9

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................................................... 16, 17

*Seattle Pacific University v. Ferguson,*
   No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) ...........................................6, 9

*Seattle's Union Gospel Mission v. Woods,*
   142 S. Ct. 1094 (2022) ........................................................................... 2, 6, 9, 13

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) ........................................................................... 16, 19

*Spencer v. World Vision, Inc.,*
   633 F.3d 723 (9th Cir. 2011) ...........................................................................11

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021)...........................................................................14

*Watson v. Jones,*
   80 U.S. 679 (1871) ...........................................................................8

*Woods v. Seattle's Union Gospel Mission,*
   197 Wash. 2d 231 (2021) ...........................................................................2, 6

**Statutes**

Wash. Rev. Code Ann. § 49.60.010...........................................................................14

Wash. Rev. Code Ann. § 49.60.030...........................................................................7

Wash. Rev. Code Ann. § 49.60.040.................................................. 5, 12, 14, 15

Wash. Rev. Code Ann. § 49.60.120.................................................................7

Wash. Rev. Code Ann. § 49.60.140.................................................................7

Wash. Rev. Code Ann. § 49.60.160.................................................................7

Wash. Rev. Code Ann. § 49.60.180.......................................................... 5, 14, 17

Wash. Rev. Code Ann. § 49.60.208.............................................................5, 18

Wash. Rev. Code Ann. § 49.60.222................................................................14

Wash. Rev. Code Ann. § 49.60.250.................................................................7

Wash. Rev. Code Ann. § 49.60.310.................................................................7

**Other Authorities**

Fed. R. Civ. P. 65...................................................................................1

Plaintiff Union Gospel Mission of Yakima, Wash. ("the Mission") moves this Court, pursuant to Fed. R. Civ. P. 65, to issue a preliminary injunction enjoining Defendants from enforcing (including through investigations) the Washington Law Against Discrimination ("the WLAD") against the Mission for:

(A) preferring and hiring only coreligionists—those who agree with and will adhere to its religious tenets and behavior requirements—for its non-ministerial positions, including its IT technician and operations assistant positions; and

(B) publishing and communicating its religious beliefs and behavior requirements for non-ministerial employees to others, including by publishing its Religious Hiring Statement.

This Motion is supported by the brief below, the Verified Complaint (ECF No. 1) and its exhibits, and the Declaration of James Johnson and its exhibits.

### INTRODUCTION

Since 1936, the Mission has served the Yakima community by "provid[ing] Christ centered rescue, recovery and restoration to men, women and children in need." Johnson Decl. ¶ 5. The Mission's religious beliefs guide and permeate everything it does. To accomplish its religious calling, the Mission maintains an internal community of coreligionists—hiring those who agree with and live according to the Mission's religious beliefs and practices. *Id.*, ¶¶ 31–34.

The Washington Law Against Discrimination ("WLAD") prohibits sexual orientation discrimination in employment. For 85 years of its history, the Mission did not have to worry about its religiously-based hiring because it was exempted from the WLAD. But all that changed recently when the Washington Supreme

Court reduced the WLAD's religious employer exemption to the "ministerial exception." *See Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231 (2021), *cert. denied,* 142 S. Ct. 1094 (2022). Defendants (collectively, "the State") are actively enforcing this new interpretation and view the Mission's Christian behavior requirements on marriage and sexuality as unlawful sexual orientation discrimination. Less than a year ago, the State began investigating a Christian university for having similar employee behavior requirements about marriage and sexuality.

  The Mission now faces significant liability for requiring non-ministerial employees to agree with and adhere to its religious beliefs on marriage and sexuality. The threat has forced the Mission to pause hiring—and remove job postings—for an IT technician and operations assistant, because those positions would not be protected under the ministerial exception.

  But "[t]he Washington Supreme Court's decision to narrowly construe [the WLAD's] religious exemption"—and the State's decision to enforce it—has "created a conflict with the Federal Constitution." 142 S. Ct. at 1096–97 (Alito, J., respecting the denial of certiorari). The WLAD now interferes with the Mission's autonomy "to decide for [itself] free from state interference, matters of [internal] government," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952), and infringes the Mission's religious exercise, association, and speech. Injunctive relief is needed.

1

## FACTS

2

### A.    Union Gospel Mission of Yakima, Wash.

3

#### 1.  The Mission is a Christian ministry.

4

Founded in 1936 to "spread the Gospel of the Lord Jesus Christ," the Mission

5

exists to follow Christ in helping people move from homelessness to wholeness."

6

Johnson Decl., ¶¶ 4–7. The Mission's religious beliefs are rooted in the Holy Bible

7

and guide everything the Mission does. *Id.*, ¶¶ 8–9.

8

Every day the Mission provides desperately needed lodging, food, and

9

assistance to the hungry and hurting of Yakima, regardless of who they are, their

10

beliefs, or their orientation or identity. *Id.*, ¶ 10. The Mission's Christian beliefs

11

instruct it to: (a) perform acts of service by caring for the homeless, hungry, sick,

12

and impoverished; (b) share the Gospel of Jesus Christ to everyone it encounters;

13

and (c) maintain an internal community of shared faith to facilitate Christian

14

fellowship, mentoring, and discipleship. *Id.*, ¶¶ 4–24. The Mission accomplishes

15

these goals through its employees. *Id.*, ¶ 21.

16

#### 2.  The Mission follows its Christian beliefs on marriage and sexuality.

17

The Mission also believes "God created humans in His image"; that "He made

18

humanity expressed in two complementary and immutable sexes, male and female,

19

each displaying features of His nature"; and that "[f]or their joy and well-being,

20

God commanded human sexual expression to be completely contained within the

21

marriage of one man to one woman." *Id.*, ¶ 26.

22

To convey a clear and consistent message to its staff and to the world, the

23

Mission requires all employees to embrace and follow its beliefs, including

prohibiting them from engaging in sexually immoral conduct. *Id.*, ¶¶ 27–29. The Mission believes that holding fellow believers accountable in their Christian lives is a necessary part of discipleship and biblical love. *Id.*, ¶ 30.

### 3. The Mission's religious hiring criteria advances its purpose.

The Mission employs more than 150 likeminded believers to be its hands, feet, and mouthpiece. *Id.*, ¶¶ 31–33. As such, the Mission only employs coreligionists—those who both *agree* with the Mission's Christian beliefs and practices (internally) and who *align* their conduct with those beliefs (externally). *Id.*, ¶ 34. The Mission will not employ someone who actively engages in sexually immoral conduct, including homosexual behavior. *Id.*, ¶ 35.

Potential applicants are informed throughout the application process that the Mission is a Christian organization that expects all employees to agree with and live out the Mission's religious beliefs. *Id.*, ¶¶ 36–39. Hired applicants must sign and agree to comply with the Mission's Statement of Faith, core values, job description duties and requirements, and employee handbook. *Id.*, ¶ 40.

Not everyone is a good fit. Every year, the Mission receives numerous applications that profess disagreement with—and at times open hostility to—its religious beliefs, particularly those about marriage and sexuality. *Id.*, ¶ 41. The Mission screens out these applications. *Id.*, ¶ 42. This allows the Mission to maintain a community of unified believers, helping to ensure that employees: (a) do Christ-centered acts of service; (b) evangelize and share the Gospel; (c) engage in Christian fellowship and discipleship; and (d) are shielded from sinful habits, behaviors, and temptations. *Id.*, ¶ 43. Hiring only coreligionists also guards against

the risk of sending mixed or contradictory messages about the Gospel of Jesus Christ to those the Mission yearns to reach. *Id.*, ¶ 44.

**B.    The Washington Law Against Discrimination.**

    **1.  The WLAD now applies to religious organizations.**

The WLAD prohibits employers from refusing to hire, discharging, barring from employment, or otherwise discriminating against a person in the compensation or other terms or conditions of employment because of sexual orientation. *Id.* § 49.60.180(1), (2), (3). It also includes a "publication ban," which prohibits publishing any statement that purports to limit employment based on sexual orientation. *Id.* § 49.60.180(4). And its "disclosure provision" forbids asking employees or applicants "to disclose … sincerely held religious affiliation or beliefs," including beliefs about marriage and sexuality. *Id.* § 49.60.208.

Since its enactment in 1949, the WLAD exempted religious organizations to avoid "potential entanglements between the state and religion." *Ockletree v. Franciscan Health Sys.*, 179 Wash. 2d 769, 785 (2014); *see also* Wash. Rev. Code Ann. § 49.60.040(11) ("'Employer' . . . does not include any religious or sectarian organization not organized for private profit."). This complete exemption "relieved" religious organizations "of the burden of predicting when their religious beliefs would be regarded as sufficient justification for an employment decision." *Ockletree*, 179 Was. 2d at 785–86.

But in 2021, the Washington Supreme Court drastically narrowed that exemption, holding that it no longer applies to claims of sexual orientation discrimination when such claims are asserted by a "non-ministerial" employee.

*Woods v. Seattle's Union Gospel Mission,* 197 Wash. 2d 231, 241–52 (2021), *cert. denied*, 142 S. Ct. 1094 (2022).

### 2. The State has already enforced the WLAD against a Christian university with similar beliefs.

The State of Washington has enforced the judicially rewritten WLAD against a Christian organization with similar employment requirements as the Mission. *See* Johnson Decl., ¶¶ 45–51. Several months after the *Woods* decision, Defendant Ferguson launched an investigation against Seattle Pacific University because the university's code of conduct prohibits employees from engaging in sexual intimacy outside of marriage between one man and one woman. *Id.* ¶¶ 46–48. In so doing, Defendant Ferguson claimed that such a prohibition unlawfully "permit[s] or require[s] discrimination on the basis of sexual orientation." Ver. Compl., Ex. 5 (ECF No. 1-5). He then encouraged people to file complaints against the university with his civil rights team. *See Attorney General Ferguson Confirms Civil Rights Investigation of Seattle Pacific University*, Office of the Attorney General (July 29, 2022), https://perma.cc/37NP-5Q72.

After the university sued, Defendant Ferguson stated that the First Amendment's protections "do not extend to discrimination against non-ministerial employees, to whom the WLAD's prohibition of employment discrimination on the basis of sexual orientation would apply." Motion to Dismiss at 17, *Seattle Pacific University v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022).

### C. The WLAD interferes with the Mission's internal employment decisions and threatens penalties.

The WLAD's religious employer exemption now only protects the Mission's

employment decisions for its "ministerial" employees. But the Mission employs non-ministerial employees too, like its IT technician and an operations assistant. Johnson Decl., ¶¶ 52–57. Yet the Mission intends to fill these positions with coreligionists—as it does for every position—because all employees must represent Christ, engage in discipleship, and advance the Mission's Christian calling. *Id.*, ¶¶ 58–63. As a result, the Mission faces substantial penalties— including burdensome attorney general and Commission investigations backed by contempt and criminal prosecution; compulsory administrative law proceedings; orders forcing hiring, reinstatement, payment of backpay and damages; and other affirmative action orders—for filling them with coreligionists Wash. Rev. Code Ann. §§ 49.60.120, 49.60.140, 49.60.160, 49.60.310, 49.60.250, 49.60.030.

To guard against these threatened penalties, the Mission has removed its IT technician posting and refrained from posting its operations assistant position, both of which need to be filled by July 1. Johnson Decl. ¶¶ 68, 80–82. The Mission also stopped using *Indeed.com* to advertise positions because, shortly after the State began investigating Seattle Pacific University, the Mission's religious hiring requirements were publicly criticized thus increasing the risk of WLAD enforcement. *Id.*, ¶ 69. The Mission also received hostile applications and was threatened with physical harm for hiring only coreligionists. *Id.*, ¶¶ 67, 71.

To be more transparent with and to further notify potential applicants of its need to hire likeminded people of faith, the Mission has adopted a Religious Hiring Statement that it intends to publish on its website. *Id.*, ¶ 73-74; Ver. Compl., Ex. 8

(ECF No. 1-8). But the WLAD's publication ban prohibits the Mission's speech that employees must follow its beliefs about marriage and sexuality. *Id*. ¶ 72.

The State's enforcement of the WLAD is forcing the Mission to decide between (a) following its sincerely held religious calling or (b) foregoing those beliefs to comply with the WLAD to avoid punishment. *Id.* ¶¶ 72–81. An injunction is needed to prevent the ongoing harm.

## LEGAL STANDARD

A preliminary injunction is warranted when the plaintiff shows: (1) a likelihood of success on the merits; (2) it will suffer or is suffering irreparable harm; (3) its harm outweighs any harm to defendants; and (4) the injunction is in the public interest. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019).

## ARGUMENT

**I.    The Mission is likely to succeed on the merits of its claims.**

**A.    Enforcement of the WLAD infringes the Mission's First Amendment right to hire only coreligionists.**

The First Amendment protects the autonomy of religious organizations. This includes the right to form "voluntary religious associations to assist in the expression and dissemination of any religious doctrine" and to adopt rules requiring "conformity of the members . . . to the standard of morals required of them." *Watson v. Jones,* 80 U.S. 679, 728–29, 733 (1871). And it includes "independence . . . to decide for themselves, free from state interference, matters of [internal] government." *Kedroff*, 344 U.S. at 116.

The constitutional right to religious autonomy thus gives religious organizations freedom to make internal membership and employment decisions. It does so through two similar, but separate, protections: the ministerial exception and the coreligionist exemption. The ministerial exception applies only to a religious group's "ministerial" employees and prevents the government from interfering with decisions involving those employees, whether or not those decisions are rooted in religious belief. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049 (2020). The State recognizes this protection but believes religious organizations' constitutional right to autonomy stops there. *See* Motion to Dismiss at 17, *Seattle Pacific University v. Ferguson,* No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) ("the First Amendment clearly protects . . . employment practices with respect to [an organization's] ministers, [but] those protections do not extend to . . . non-ministerial employees").

But "the guarantee of [religious] autonomy is not so narrowly confined." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari). The coreligionist exemption, in contrast, applies to *all employees* but is limited to decisions rooted in religious belief, practice, or adherence. *Id.*

### 1. Both Religion Clauses require the coreligionist exemption.

This case is about the coreligionist exemption, which furthers both Free Exercise and Establishment Clause principles.

First, because the Free Exercise Clause "mandate[s]" a certain level of "noninterference" with religious groups' employment decisions,

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334 (1987), the coreligionist exemption protects religious groups' free exercise of religion. Religious groups exercise their religion by living out their faith at work, and employees must be able to be an example to each other in word and deed to encourage holy living.

Second, the coreligionist exemption prevents Establishment Clause violations by keeping government officials from wading into religious groups' faith-based decisions. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501–04 (1979) (the "very process of inquiry" by the government into religious schools' employment decisions "impinge on rights guaranteed by the Religion Clauses"). It also avoids the excessive entanglement that would occur if government officials could investigate and second-guess whether a position is sufficiently "religious" to merit First Amendment protection. Indeed, "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment." *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977). The coreligionist exemption avoids this problem by letting religious groups freely engage in the "process of self-definition." *Amos,* 483 U.S. at 342–44 (Brennan, J., concurring).

The Ninth Circuit has recognized this *constitutional* right to prefer coreligionists while analyzing Title VII's religious exemption. In *E.E.O.C. v. Townley Eng'g & Mfg. Co.,* 859 F.2d 610, 618 n. 13 (9th Cir. 1988), the Ninth Circuit explained that "even without [Title VII's religious exemption], the First Amendment would limit Title VII's ability to regulate the employment

relationships within churches and similar organizations." And in a split ruling in *Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2011), Judge O'Scannlain concluded that a "cramped reading" of Title VII's religious exemption "raises serious questions under both the Free Exercise Clause and the Establishment Clause." *Id.* at 729 (O'Scannlain, J., concurring). So he refused to wade into "the constitutional briar patch of distinguishing between the sacred and the secular" when a religious nonprofit's "humanitarian relief efforts" were concerned. *Id.* at 731–732. Judge Kleinfield concurred: "If the government coerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the *shield against discrimination would destroy the freedom of Americans to practice their religions*." *Id.* at 742 (Kleinfield, J., concurring) (emphasis added).

Other federal courts of appeal agree. *See Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) (religious groups have a "constitutionally-protected interest . . . in making religiously motivated employment decisions"); *Little v. Wuerl,* 929 F.2d 944, 947, 951 (3d Cir. 1991) (penalizing a Catholic school for deciding to "employ only persons whose beliefs and conduct are consistent with [its] religious precepts" "would arguably violate both Religion Clauses"); *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980) (Title VII's religious exemption avoids "conflicts [with] the religion clauses"); *Killinger v. Samford Univ.*, 113 F.3d 196, 201 (11th Cir. 1997) (same); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002) (religious autonomy protects religiously motivated employment decisions).

### 2.  The WLAD violates the coreligionist exemption.

The State's enforcement of the WLAD raises the very constitutional concerns discussed above and violates the coreligionist exemption as applied to the Mission. This infringement on religious autonomy is per se unconstitutional. *See, e.g., Bryce*, 289 F.3d at 659.

Everything the Mission does is rooted in its religious beliefs. Its purpose is to "spread the Gospel of the Lord Jesus Christ." And it does so through its shelter and emergency services, recovery programs, outreach efforts, health clinics, and interactions with the people of Yakima. The Mission's Christian beliefs compel it to serve the poor and needy and to disciple one another.

None of this is possible without employees who agree with and live out the Mission's religious beliefs; who seek to advance the same mission; and who desire to transform lives through Jesus Christ. After all, the Mission is an organization made up of *individuals* who the Mission depends on to live out the faith, put belief into action, and to aid one another in their spiritual growth. Employees who reject, disagree, or live a life contrary to that faith cannot credibly demonstrate it to others. Instead, they would actively undermine it.

As enacted by the Washington Legislature, the WLAD codified what the Constitution required: religious organizations could prefer coreligionists for *all* positions. Wash. Rev. Code Ann. § 49.60.040(11). But that protection is gone. Now the State will parse out the Mission's employees position-by-position to decide if they are "religious" enough to be considered "ministerial" and thus merit

statutory protection, creating the very entanglement problems the Religion Clauses forbid.

The consequences are severe. Religious organizations like the Mission cannot decline to hire someone to a non-ministerial position who disagrees with it about marriage and sexuality. This forces the Mission "to hire messengers and other personnel who do not share [its] religious views," which "undermine[s] not only [its] autonomy . . . but also [its] continued viability." *Woods*, 142 S. Ct. at 1096. The State's commandeering of the Mission's employment decisions through the WLAD leads to the forced inclusion of employees "who fundamentally disagree" with the Mission, "infring[ing] [its] right[ ] to freely exercise religion." *Id.* Because the WLAD no longer protects the Mission's right to hire coreligionists for non-ministerial positions, the Mission's *constitutional* right to do so must step in.

### B. The WLAD is not neutral and generally applicable and violates the Free Exercise Clause.

The WLAD violates the Free Exercise Clause for another reason: it is neither neutral nor generally applicable and cannot satisfy strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see infra* § I.E.

"Neutrality and general applicability are interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia,* 141 S. Ct. 1868,

1877 (2021). One exemption is enough: "government regulations are not neutral

and generally applicable . . . whenever they treat *any* comparable secular activity

more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296

(2021) (per curiam).

The "purpose" of the WLAD is to "eliminat[e] and prevent[ ] discrimination."

Wash. Rev. Code Ann. § 49.60.010. But the WLAD is "underinclusive for those

ends." *Lukumi*, 508 U.S. at 543. For one, it completely exempts secular employers

with fewer than eight employees, giving them the freedom to discriminate in their

employment decisions. *See* Wash. Rev. Code Ann. § 49.60.040(11). It also

exempts "distinctly private" organizations from the WLAD's public

accommodation provision, *id.* § 49.60.040(2), and permits public or private

educational institutions to separate and give preferential treatment based on sex, *id.*

§ 49.60.222(3). Because these exemptions undermine the State's purported interest

in eliminating and preventing discrimination to "a similar or greater degree" than

would accommodating the Mission, the WLAD is not generally applicable.

*Lukumi*, 508 U.S. at 543.

For another, the WLAD "provid[es] a mechanism for individualized

exemptions." *Fulton*, 141 S. Ct. at 1877 (quotation marks and citation omitted).

Indeed, the Commission is authorized "by regulation or ruling in a particular

instance" to permit *any* employment practice if the Commission finds the practice

"to be appropriate for the practical realization of equality of opportunity between

the sexes." Wash. Rev. Code Ann. § 49.60.180(3). So the Commission has

unfettered discretion to hand out exemptions if it believes doing so is "appropriate"

for the "equality of opportunity between the sexes." And such exemptions would allow the employer to discriminate based on sexual orientation. *See id.* § 49.60.040(26), (27) (broadly defining "sex" as "gender" and "gender expression or identity" as part of "sexual orientation").

### C.    The WLAD violates the Mission's right to expressive association.

The State's forced inclusion of nonbelievers also infringes the Mission's First Amendment right "to associate with others in pursuit of . . . religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). This right to expressive association includes "freedom not to associate" with people who "may impair [the group's] ability" to express its views. *Id.* at 647–48. The right applies if (1) "the group engages in 'expressive association,'" and (2) "the forced inclusion" of a person "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* The Mission satisfies both elements.

First, the Mission "engage[s] in some form of expression." *Id.* at 648. The Mission was created with the express purpose "to spread the Gospel of the Lord Jesus Christ," which it does through all its employees. Johnson Decl., ¶ 4. Indeed, the Mission's employees share the Gospel, spread Christian teachings, and pray with virtually everyone—shelter guests, recovery program participants, thrift store shoppers, and the homeless on the streets. *Id.* ¶¶ 19–24. The Mission also expresses its views during and through its hiring process. It tells every applicant that it is a Christian ministry that seeks to transform lives not only through its services but also by spreading its faith and being an example to other Christians. *Id.* ¶ 36–40. In short, the Mission's "very existence is dedicated to the collective

expression and propagation of shared religious ideals" and "there can be no doubt that the messenger matters" in the Mission's religious expression. *Hosanna-Tabor*, 565 U.S. 171, 200–201 (2012) (Alito, J., concurring).

Second, by subjecting the Mission to possible penalties for hiring only likeminded individuals, the State forces the Mission to hire people who "would significantly affect" its ability to convey its religious message. *Dale*, 530 U.S. at 650. Courts must "give deference to an association's view of what would impair its expression." *Id.* at 653. And just as in *Dale*, an employee who disagrees with the Mission's religious beliefs on marriage and sexuality "force[s] [the Mission] to send a message, both to [fellow-members] and the world, that [the Mission] accepts homosexual conduct as a legitimate form of behavior," *id.* at 653, undermining the Mission's religious mission and Christian message and beliefs.

The reason why is obvious. If employees openly disagreed with the Mission's beliefs about marriage and sexuality, those employees could not effectively communicate—let alone defend—those beliefs to others. Fortunately, "[t]he right to expressive association allows [a religious organization] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Slattery v. Hochul*, 61 F.4th 278, 288 (2d Cir. 2023).

**D.    The WLAD violates the Free Speech Clause.**

The Mission expresses its religious hiring requirements through its website and various documents. *See* ECF Nos. 1-4, 1-6, 1-7, 1-8. But the WLAD's publication and disclosure provisions regulate speech based on content and viewpoint. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). A law is content-

based if it regulates speech "because of the topic discussed or the idea or message expressed." *Id*. at 163 The publication and disclosure provisions are thus presumptively unconstitutional and must overcome strict scrutiny, which they cannot. *Id*.; *see infra* § I.E.

### 1. The publication provision limits speech based on viewpoint.

The WLAD's publication provision facially restricts speech based on viewpoint—"the idea or message expressed." *Id*. The provision makes it unlawful to "express[ ] any limitation, specification, or discrimination as to . . . sexual orientation" through (1) "any statement, advertisement, or publication," (2) "any form of application for employment," or (3) "any inquiry in connection with prospective employment." Wash. Rev. Code Ann. § 49.60.180(4). By its plain terms, the publication provision regulates speech based on the view espoused. Employers can print statements encouraging people of all sexual orientations to apply; they cannot print statements informing applicants they must hold certain views about sexuality or marriage.

But the Mission's website, Religious Hiring Statement, and other documents do just that: they tell applicants they must agree with, adhere to, and live out the belief that "God commanded human sexual expression to be completely contained within the marriage of one man to one woman." ECF No. 1-2. Such statements "express a[ ] limitation" based on sexual orientation and are barred by the WLAD.

### 2. The disclosure provision shuts off an entire category of speech.

Likewise, the disclosure provision facially restricts speech based on subject matter—the "topic discussed." *Reed*, 576 at 163. It flatly prohibits an employer

from "[r]equir[ing] an employee to disclose his or her sincerely held religious beliefs." Wash. Rev. Code Ann. § 49.60.208. To be sure, religious employers remain exempt from this provision under the WLAD's religious employer exemption for its ministerial employees, but not others. As a result, a secular employer can ask employees about their political or philosophical beliefs, but—under *Woods*' reasoning—a religious employer cannot ask its employees about their religious beliefs about sexual orientation. The WLAD thus unconstitutionally shuts off an entire category of speech. *See Reed,* 576 at 169 ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."). Yet the Mission's application plainly asks about applicants' religious beliefs about marriage and sexuality, thus threatening the Mission with penalties under the WLAD.

### E.    The WLAD fails strict scrutiny.

Because the WLAD infringes the Mission's First Amendment rights, it must survive strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). This means that the State must prove enforcement of the WLAD specifically against the Mission serves a compelling interest and is narrowly tailored to achieve that interest. *Fulton*, 141 S. Ct. at 1881; *Dale*, 530 U.S. at 648; *Reed*, 576 at 171. It cannot do so.

A compelling interest cannot be "broadly formulated" or based on speculation. *Fulton*, 141 S. Ct. at 1881–82 (citation omitted). So the State cannot assert "a compelling interest in enforcing [their] non-discrimination policies generally"; instead it must give a compelling reason to deny an exception to the Mission. *Id.*

But there can be no compelling interest in forcing a *religious ministry* to employ people who have conflicting *religious beliefs*. *See Slattery*, 61 F.4th at 289 (an interest in preventing discrimination "cannot overcome the expressive rights of an association dedicated to . . . opposing that specific conduct"). Any alleged interest in preventing discrimination does not "justify such a severe intrusion" on the Mission's "freedom of expressive association" and religious exercise and speech. *Dale*, 530 U.S. at 659.

In any event, the WLAD's exemptions are fatal to any asserted compelling interest. As discussed, the WLAD contains categorical exemptions for small employers, distinctly private clubs, and educational institutions, *and* a mechanism for individualized exemptions, *supra* § I.B., thus undermining any contention that its "non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. "[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up).

Nor is the WLAD narrowly tailored to achieve any interest in nondiscrimination or otherwise. If the government "can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. The Washington Legislature narrowly tailored the WLAD by enacting a total exemption for religious employers, but the Washington Supreme Court gutted that exemption. Yet the existence of both individualized and categorical exemptions in the WLAD shows that there are less restrictive alternatives that still accomplish the State's interests, whatever those interests may be.

## II.    The other preliminary injunction factors weigh heavily in favor of granting injunctive relief.

In First Amendment cases, the preliminary injunction analysis essentially reduces to a single question: whether the plaintiff is likely to succeed on the merits. *See Am. Beverage Ass'n*, 916 F.3d at 758. That is because a likely First Amendment violation "compels a finding that the balance of hardships tips sharply in [the Mission's] favor" and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up and citations omitted). The loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

For close to 100 years, the Mission has pursued its religious convictions and mission by preferring coreligionists for *all positions* without the threat of government punishment. That's because, as enacted, the WLAD completely exempted religious organizations. But that freedom was suddenly gutted by the *Woods* decision and the State's subsequent enforcement of the newly interpreted WLAD against religious organizations who hold disfavored beliefs on marriage and sexuality. A preliminary injunction would simply allow the Mission to continue its longstanding religious hiring practices and to fill its IT technician and operations assistant positions while this litigation proceeds, preserving the Mission's constitutional rights in the meantime. Meanwhile, a preliminary injunction will not harm the State at all.

### CONCLUSION

The Court should issue a preliminary injunction.

Respectfully submitted this 5th day of April 2023,

*s/ Katherine Anderson*

Katherine Anderson
WA Bar No. 41707
AZ Bar No. 29490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5th, 2023, I electronically filed the foregoing paper with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record.

*s/ Katherine Anderson*
Katherine Anderson