Katherine Anderson
WA Bar No. 41707
AZ Bar No. 29490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **UNION GOSPEL MISSION OF YAKIMA, WASH.**, <br><br> *Plaintiff,* <br><br> v. <br><br> **ROBERT FERGUSON, ET AL.**, <br><br> *Defendants.* | Civil Case No.: 1:23-cv-03027 <br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> MAY 31, 2023, AT 9:00 a.m. <br> ORAL ARGUMENT |

## TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Introduction ...........................................................................1

Summary of Facts ...................................................................2

    A.   The Mission's religious beliefs and employment practices......................2

    B.   The WLAD and *Woods v. Seattle's Union Gospel Mission.* ....................3

    C.   The State enforces the WLAD, threatening the Mission. ...........................5

Argument.................................................................................7

 I.   The Mission has standing because this is a proper pre-enforcement case....7

    A.   The Mission faces a credible threat of enforcement of the WLAD...........7

    B.   The Mission's injury is traceable to Defendants.....................................15

    C.   The Mission's injury is redressable by a favorable court decision..........16

 II.   This case is ripe. ..........................................................19

Conclusion ...........................................................................20

Certificate of Service ............................................................22

## TABLE OF AUTHORITIES

**Cases**

*Apex Abrasives, Inc. v. WGI Heavy Minerals, Inc.*,
   737 F. App'x 325 (9th Cir. 2018) ....................................................13

*Arizona v. Yellen*,
   34 F.4th 841 (9th Cir. 2022)............................................................9

*Bronson v. Swensen*,
   500 F.3d 1099 (10th Cir. 2007).....................................................16

*California Rest. Ass'n v. City of Berkeley*,
   No. 21-16278, 2023 WL 2962921 (9th Cir. Apr. 17, 2023) .................7

*California Trucking Association v. Bonta*,
   996 F.3d 644 (9th Cir. 2021)................................................... 10, 12

*Calzone v. Hawley*,
   866 F.3d 866 (8th Cir. 2017) .........................................................16

*Colorado River Water Conservation District v. United States*,
   424 U.S. 800 (1976) ......................................................................19

*Human Life of Washington Inc. v. Brumsickle*,
   624 F.3d 990 (9th Cir. 2010)..........................................................12

*Italian Colors Restaurant v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018)........................................ 8, 10, 11, 14

*Larson v. Valente*,
   456 U.S. 228 (1982) ......................................................................19

*Libertarian Party of Los Angeles County v. Bowen*,
   709 F.3d 867 (9th Cir. 2013)..........................................................11

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010)......................................................7, 13

*M.S. v. Brown*,
    902 F.3d 1076 (9th Cir. 2018)................................................................16

*Massachusetts v. Environmental Protection Acency*,
    549 U.S. 497 (2007) ....................................................................................19

*National Labor Relations Board v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979) ....................................................................................13

*Planned Parenthood of Idaho, Inc. v. Wasden*,
    376 F.3d 908 (9th Cir. 2004)....................................................................15

*Seattle Pacific University v. Ferguson*,
    No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) ..............................6, 8

*Seattle's Union Gospel Mission v. Woods*,
    142 S. Ct. 1094 (2022)........................................................ 1, 4, 18

*Skyline Wesleyan Church v. California Department of Managed Health Care*,
    968 F.3d 738 (9th Cir. 2020)........................................ 16, 18, 19, 20

*Sullivan v. Ferguson*,
    No. 3:22-CV-05403-DGE, 2022 WL 13969427 ....................................15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .......................................................... 7, 9, 13, 14

*The Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ....................................................................11

*Thomas v. Anchorage Equal Rights Commission*,
    220 F.3d 1134 (9th Cir. 2000).................................................... 8, 19, 20

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022)................................................... passim

*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022)....................................................................10

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010).................................................... 16, 18

*Woods v. Seattle's Union Gospel Mission*,
   197 Wash. 2d 231 (2021) ......................................................................1, 4

**Statutes**

Wash. Rev. Code Ann. § 49.60.030.................................................................3

Wash. Rev. Code Ann. § 49.60.040.................................................................3

Wash. Rev. Code Ann. § 49.60.180.............................................................6, 11

Wash. Rev. Code Ann. § 49.60.230................................................................14

Wash. Rev. Code Ann. § 49.60.250.................................................................3

Wash. Rev. Code Ann. § 49.60.310................................................................14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## INTRODUCTION

For decades of its existence, the Union Gospel Mission of Yakima, Wash. ("the Mission") never had to worry about liability under the Washington Law Against Discrimination ("WLAD") for hiring only coreligionists to advance its religious mission. But that all changed when Washington Supreme Court decided *Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231 (2021), *cert. denied,* 142 S. Ct. 1094 (2022)—which held that the WLAD's blanket religious employer exemption cannot apply to claims of sexual orientation discrimination brought by a non-ministerial employee—and when the State decided to enforce this "new" interpretation. *Woods* and the State's enforcement opened up a whole new world of liability for religious organizations.

Just last summer, the State enforced the WLAD against Seattle Pacific University ("SPU"), believing the school discriminates based on sexual orientation for enforcing its employment policy that requires *all* employees to agree with and live out its religious beliefs, including the belief that same sex conduct is wrong. The Mission has substantially the same policy, making it the State's next target. Yet the Mission need not sit and wait until it finds itself in the same position as Seattle Pacific. Rather, it has standing to sue now. There is a credible threat of WLAD enforcement against the Mission—shown by the State's failure to disavow enforcement, its actual enforcement against SPU, and the threat of third-parties filing complaints—that has caused the Mission to chill its First Amendment activities resulting in current and future harm. This harm is directly traceable to the Defendants ("the State"), who are tasked with and are currently enforcing the

WLAD. And this harm is redressable by enjoining WLAD enforcement against the Mission for enforcing its Christian behavior requirements. Similarly, this case is ripe because the issue is primarily a legal one and no additional facts need developed. But withholding review—and judicial relief—will result in continuing harm to the Mission's internal operations and ability to exist as a ministry.

<u>SUMMARY OF FACTS</u>

**A.  The Mission's religious beliefs and employment practices.**

The Mission is a Christian ministry, so its religious beliefs guide and permeate everything it does. ECF No. 1, Verified Complaint ("VC") ¶¶ 30–31. Those beliefs compel the Mission to: (a) perform acts of service by caring for the homeless, hungry, sick, and impoverished; (b) share the Gospel of Jesus Christ to everyone it encounters; and (c) maintain an internal community of shared faith to facilitate Christian fellowship, mentoring, and discipleship. *Id.* ¶¶ 32–62.

The Mission also holds and adheres to traditional Christian views on marriage and sexuality, believing that God: (a) "created humans in His image," (b) "made humanity expressed in two complementary and immutable sexes, male and female," and (c) "commanded human sexual expression to be completely contained within the marriage of one man to one woman, equally naming every other expression sinful." *Id.* ¶¶ 63–64. The Mission believes any sexual activity outside of biblical marriage, including homosexual conduct, is sin. *Id.* ¶ 65.

Because the Mission is an organization, it furthers and fulfills its religious purposes—including its acts of service, evangelism, and internal discipleship—through all its employees. *Id.* ¶ 69. So the Mission only employs coreligionists:

1    those who both *agree* with the Mission's Christian beliefs and practices (internally)

2    and who *align* their conduct with those beliefs (externally). *Id.* ¶ 70–71. And

3    because the Mission requires everyone to be a coreligionist, it cannot employ

4    someone who actively engages in what it views to be sin, which includes

5    homosexual conduct. *Id.* ¶¶ 66, 85. This ensures every employee is united with,

6    and partakes in, the Mission's collective ministry effort and can accurately spread

7    the Mission's religious message. *Id.* ¶¶ 72–73.

8        Every year, the Mission receives employment applications that profess

9    disagreement with—and at times open hostility to—its religious beliefs,

10   particularly those about marriage and sexuality. *Id.* ¶¶ 81–82. The Mission screens

11   out these applications, and will not hire someone who actively lives a lifestyle

12   inconsistent with scripture. *Id.* ¶¶ 83–85.

13   ## B.   The WLAD and *Woods v. Seattle's Union Gospel Mission.*

14       The WLAD prohibits employment discrimination based on various protected

15   classes, including sexual orientation (and gender identity). Wash. Rev. Code Ann.

16   ("WRC") § 49.60.030(1). Defendants have authority, and use various tools, to

17   enforce the WLAD. VC ¶¶ 22, 25, 93–95 (authority to enforce the WLAD); *id.* ¶¶

18   96–105 (enforcement and penalties under the WLAD). A violation of the WLAD

19   carries substantial penalties, including affirmative action orders and damages. *See*

20   *e.g.,* WRC § 49.60.250(5). The WLAD also has a private right of action. *Id.* §

21   49.60.030(2). The WLAD exempts employers with fewer than eight employees,

22   and before *Woods*, totally exempted nonprofit religious organizations. *Id.* §

23   49.60.040(11).

1    In late 2016, when applying for a position at Seattle's Union Gospel Mission,

2    an individual stated that he was in a same-sex relationship. *Woods*, 197 Wash. 2d

3    at 237. The rescue mission declined to hire him because his open lifestyle

4    conflicted with its religious beliefs on homosexual behavior. *Id.* That individual

5    then sued for sexual orientation discrimination, but the trial court found the

6    mission exempt under the WLAD's religious employer exemption. *Id.* at 238. The

7    Washington Supreme Court granted review, and conducting solely a state

8    constitutional analysis, held the WLAD's religious employer exemption

9    "constitutionally invalid as applied" to claims of sexual orientation discrimination.

10    *Id.* at 237. The court found the First Amendment's ministerial exception to be a

11    proper replacement for the WLAD's religious employer exemption. *Id.* at 246–52.

12    But its holding was unmistakable: religious organizations are no longer exempt

13    under the WLAD for sexual orientation claims brought by non-ministerial

14    employees. *Id.*

15    The rescue mission sought certiorari at the Supreme Court. The Court denied

16    the petition, but Justices Alito and Thomas noted that state supreme court "did not

17    address whether applying state employment law to require the Mission to hire

18    someone who is not a co-religionist would infringe the First Amendment," and

19    explained that the court's "decision to narrowly construe that religious exemption

20    to avoid conflict with the Washington Constitution may, however, have created a

21    conflict with the Federal Constitution." *Seattle's Union Gospel Mission v. Woods,*

22    142 S. Ct. 1094, 1096 (2022). They concluded review of the issue may be

23    "warranted in the future." *Id.* (cleaned up).

### C.  The State enforces the WLAD, threatening the Mission.

A little over a year after the *Woods* decision, and just two months after the Supreme Court denied certiorari, Seattle Pacific University decided to retain its longstanding employee lifestyle policy regarding sexual conduct. *See SPU Board of Trustees Reaches Decision on Employee Lifestyle Expectations*, Seattle Pacific University (May 23, 2022), https://perma.cc/GVP9-NZZ8; VC ¶ 117. Seattle Pacific's policy requires faculty and staff "to affirm SPU's Statement of Faith" and to abide by conduct standards, which include "refrain[ing] from sexual behavior that is inconsistent with the University's understanding of Biblical standards, including cohabitation, extramarital sexual activity, and same-sex sexual activity." *FAQs on SPU Board Decision*, Seattle Pacific University (May 23, 2022), https://perma.cc/RJ9D-YYWY. Seattle Pacific's policy is thus substantially equivalent to the Mission's hiring policies, which also prohibit employees from engaging in sexual conduct outside of biblical marriage. ECF No. 14-1, Johnson Decl., ¶¶ 48-51. Almost immediately after SPU's decision, Defendant Ferguson launched an investigation into SPU, stating that the University's policies "permit or require discrimination on the basis of sexual orientation." ECF No. 1-5, p. 71. Defendant Ferguson requested myriad documents and also asked SPU to sign a litigation hold. *Id.*, pp. 72–74.

SPU sued. In moving to dismiss the complaint, Defendant Ferguson cemented the State's position that the First Amendment's "protections do not extend to discrimination against non-ministerial employees, to whom the WLAD's prohibition of employment discrimination on the basis of sexual orientation would

1    apply." Motion to Dismiss at 17, *Seattle Pacific University v. Ferguson*, No. 3:22-

2    cv-05540 (W.D. Wash. Oct. 26, 2022) (cleaned up). The State also argued *Younger*

3    abstention prevented the federal court from hearing SPU's federal claims because

4    the State's investigation of SPU was an "ongoing civil enforcement action that

5    [was] 'quasi-criminal' in nature." *Id.* at 15 (citation omitted). The State thus made

6    clear that the reinterpreted WLAD applies to religious organizations, and that it

7    already had enforced it. *See also* VC ¶ 124 (noting similar statements).

8        Soon after the State's probe into SPU, the Mission's religious hiring

9    requirements caught significant media attention. First, its application was posted

10   on *Reddit.com*, where hundreds of users disparaged the Mission's beliefs and

11   suggested the publisher file a discrimination complaint against the Mission. VC ¶¶

12   150–56. Second, *Newsweek* published an article on the same thing. *Id.* And third,

13   the Mission received threats because it hires only coreligionists. *Id.*

14       Knowing these third parties could file complaints under the WLAD, the

15   Mission sought to lessen the risk of WLAD enforcement by pausing its hiring for

16   two positions that would not be protected by the ministerial exception. VC ¶¶ 126–

17   47, 160. And it also refrained from posting its Religious Hiring Statement given

18   the State's active enforcement of the WLAD and the risk of violating its

19   publication plan. *Id.* ¶¶ 161–62; *see* WRC § 49.60.180(4). The Mission would

20   continue these practices but for the State's enforcement of the WLAD, which is (a)

21   currently harming the Mission by chilling and interfering with its First Amendment

22   activities, and (b) threatening imminent future harm for continuing to hire *only*

23   coreligionists. *Id.* ¶¶ 163–69.

<u>**ARGUMENT**</u>

**I.  The Mission has standing because this is a proper pre-enforcement case.**

The Mission's Complaint sufficiently alleges facts to stay in Court. *California Rest. Ass'n v. City of Berkeley,* No. 21-16278, 2023 WL 2962921, at \*3 (9th Cir. Apr. 17, 2023) (at the pleading stage, "general factual allegations of injury ... suffice"). The Mission's burden is low because "First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010).

Article III standing requires the Mission to show (1) an injury in fact, (2) that is traceable to the Defendants, and (3) that is likely to be redressed by a favorable decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) ("*SBA List*"). Yet the Mission need not sit in the crosshairs and wait for the government to pull the trigger before challenging the unconstitutional application of a state law like the WLAD. *See id.* Instead, the Mission has standing because it is facing an ongoing injury and "certainly impending" imminent future injury under the WLAD that is traceable to Defendants and redressable by this Court. *Id.*

**A. The Mission faces a credible threat of enforcement of the WLAD.**

Under *SBA List*, a plaintiff satisfies the injury in fact requirement where he alleges "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, [2] but proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159 (citation omitted). The State concedes the first two factors, only arguing there is no credible threat of enforcement of the WLAD against the Mission. *See* ECF No. 11 ("MTD") at 8–10.

The Ninth Circuit looks to three factors to determine if there is a credible threat of enforcement sufficient to confer standing: "(1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" *Tingley*, 47 F.4th 1055, 1067 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). The Mission has alleged facts to satisfy all three *Thomas* factors, demonstrating a credible threat of enforcement of the WLAD. The State's arguments to the contrary fall short.

**1.  The Mission concretely intends to continue hiring only coreligionists, which violates the WLAD.**

The State does not argue—because it can't—that the Mission does not have a concrete plan to violate the WLAD, so this factor bears little mentioning. Yet to be clear, the Verified Complaint plainly alleges that the Mission cannot and will not hire someone who actively engages in any sexual activity outside of biblical marriage, such as homosexual conduct. *See* VC ¶¶ 63–67, 70–73, 85, 143. It also alleges the Mission intends to continue enforcing this practice, *id.* ¶ 163, which violates the WLAD's prohibition on sexual orientation discrimination. Motion to Dismiss at 17, *Seattle Pacific University,* No. 3:22-cv-05540 ("the WLAD's prohibition of employment discrimination on the basis of sexual orientation" applies to religious organizations' non-ministerial employees); *see also Italian Colors Rest. v. Becerra,* 878 F.3d 1165, 1174 (9th Cir. 2018) (alleging one would act "if it were legal to do so" shows a "specific intent" to violate the law).

It also does not matter that the Mission "cannot control when" a person with contrary beliefs will apply for one of its positions, because it has already "describe[d] 'specific past instances of [hiring only coreligionists] in a way that would violate the law." *Tingley*, 47 F.4th at 1068. The Mission stated that it routinely receives applications that reflect disagreeing views on marriage and sexuality, and that it "categorically screens out all such applicants." VC ¶¶ 81–83.

As such, the Mission has alleged a concrete intention to continue its religious hiring practices, which violates the recently re-written WLAD.

### 2. The State need not specifically threaten the Mission and has not disavowed enforcement of the WLAD.

The State next argues that there is no threat of enforcement of the WLAD because the State "has not communicated anything to [the Mission] at all." MTD at 9 (emphasis deleted). But this argument fails for at least three reasons.

First, the State need not specifically warn or threaten the Mission to give rise to a credible threat of enforcement. *Tingley*, 47 F.4th at 1068. Rather, the State's "failure to *disavow* enforcement of the law ... weigh[s] in favor of standing." *Id.*; *accord SBA List*, 573 U.S. at 165. Since the Washington Supreme Court issued its decision in *Woods*, the State has had every opportunity to say it will not enforce the re-written WLAD against religious organizations. It hasn't. Nor has the State disavowed enforcement against the Mission since filing this lawsuit. The failure to disavow enforcement "is evidence of an intent to enforce" the WLAD and alone is enough to show a credible threat of enforcement. *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022).

Second, the State has communicated an intent to enforce the WLAD. For one thing, Defendant Ferguson's initial letter to Seattle Pacific specifically warned that the University's code of conduct on marriage and sexuality (which is essentially the same as the Mission's) "may violate the [WLAD]." ECF No. 1-5, p. 71. For another, the State *has* "notifi[ed] the regulated community that it intends to enforce" the law. *California Trucking Ass'n v. Bonta,* 996 F.3d 644, 653 (9th Cir. 2021). While investigating Seattle Pacific, Defendant Ferguson *vowed* to enforce the WLAD against religious organizations, stating it was his "job" to "uphold Washington's law prohibiting discrimination, including on the basis of sexual orientation" and even encouraged Washingtonians to file complaints against Seattle Pacific. *Attorney General Ferguson Confirms Civil Rights Investigation of Seattle Pacific University*, Office of the Attorney General (July 29, 2022), https://perma.cc/37NP-5Q72.

Third, the threat of WLAD enforcement has already "forced [the Mission] to modify [its] speech and behavior to comply with the statute." *Italian Colors*, 878 F. 3d at 1173 (cleaned up). Indeed, "in the First Amendment context, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (cleaned up).

In *Italian Colors*, the Ninth Circuit held that a group of California businesses had standing to challenge California's credit card surcharge ban even though California never communicated any threat or warning against them. *Italian Colors*,

878 F. 3d at 1173. The businesses refrained from imposing credit card surcharges for fear of enforcement of the law but said they would "if it were legal to do so." *Id.* at 1168. The court explained the fear of enforcement was reasonable because the law had not "fallen into desuetude," California "refused to stipulate that [it] will not enforce the statute," and private citizens could sue to enforce it. *Id.* at 1173. And more recently, the Court held the same in *Tingley*, finding a counselor's allegation that Washington's conversion therapy ban chilled his speech was sufficient for standing even though the state did not specifically warn or threaten him. 47 F.4th at 1068.

The same is true here: the recently re-written WLAD has chilled "the exercise of [the Mission's] First Amendment rights [which] is, itself, a constitutionally sufficient injury." *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). Because of the State's enforcement of the narrowed WLAD, the Mission has removed two job postings from its website—jobs which the Mission could face WLAD liability if it were to require applicants to obey its biblical beliefs on marriage and sexuality. *See The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) ("a church suffers organizational injury because its ability to carry out its ministries has been impaired"). And to avoid violating the WLAD's publication provision—which prohibits the Mission from posting statements that "express a limitation" based on sexual orientation, WRC § 49.60.180(4)—the Mission has refrained from publishing its Religious Hiring Statement, thus chilling its speech, *see Hum. Life of Washington Inc. v.*

1    *Brumsickle,* 624 F.3d 990, 1001 (9th Cir. 2010) (cleaned up) ("Such fear exists if

2    the 'intended speech arguably falls within the statute's reach.'").

3        In short, the Mission does not have to wait until the State targets it to

4    challenge the WLAD. The State's failure to disavow enforcement, its intention to

5    enforce the WLAD, and the WLAD's chilling effect on the Mission all support a

6    credible threat of enforcement.

7    ### 3.    The State has already enforced the WLAD against SPU, who has essentially the same religious behavior requirements as the Mission.

8

9        The third *Thomas* factor about past enforcement also weighs in the Mission's

10   favor. In *Tingley* the Ninth Circuit held enforcement history is irrelevant when "the

11   first two *Thomas* factors are satisfied by the 'general factual allegations of injury'"

12   in the complaint. *Tingley*, 47 F.4th at 1069. As explained above, the Mission

13   satisfies the first two *Thomas* factors. *See* VC ¶¶ 85, 116–125, 157–164. Similarly,

14   history of enforcement "carries 'little weight when the challenged law is relatively

15   new and the record contains little information as to enforcement.'" *Id.* (quoting

16   *Cal. Trucking*, 996 F.3d at 653). While the WLAD is not a "new" law, the

17   WLAD's prohibition on sexual orientation discrimination as applied to religious

18   organizations *is new*—before the *Woods* decision in 2021, religious organizations

19   were completely exempt from the WLAD. So even if there was sparse enforcement

20   in the past, the Mission still faces a credible threat today

21       Yet to remove all doubt, there *is* enforcement history. The Mission "need not

22   be the direct target of government enforcement," instead, the State's "history of

23   past enforcement against parties similarly situated to [the Mission] cuts in favor of

conclusion that a threat is specific and credible." *Lopez*, 630 F.3d at 786–87; *accord SBA List,* 573 U.S. 164 ("past enforcement against the same conduct is good evidence" of a future threat of enforcement).

Just a year after *Woods* (and within the last year), the State enforced the "newly" interpreted WLAD against Seattle Pacific University, who requires employees to abide by the same Christian beliefs on marriage and sexuality as the Mission. This investigation to determine compliance with the WLAD is, itself, enforcement of the WLAD. *See SBA List*, 573 U.S. at 165 ("administrative action ... may give rise to harm sufficient to justify pre-enforcement review"); *Lopez,* 630 F.3d at 786–87 ("The threatened state action need not necessarily be a prosecution."). This is especially so given that the State investigated a *religious organization's* internal practices. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501–04 (1979) (the "very process of inquiry" by the government into religious schools' employment decisions "impinge on rights guaranteed by the Religion Clauses").

The State's attempt to downplay this past enforcement fails. First, the State asserts it "did not threaten any legal action" against Seattle Pacific. MTD at 9. But Defendant Ferguson's investigation letter to Seattle Pacific explicitly instructed the University to execute a litigation hold under penalty of perjury, *see* ECF No. 1-5, p. 74, meaning the State saw "litigation [as] reasonably foreseeable," *Apex Abrasives, Inc. v. WGI Heavy Mins., Inc*., 737 F. App'x 325, 327 (9th Cir. 2018).

Next, the State says there is no past enforcement "involving the protected activities of religious employers." MTD at 9. But that's exactly what the SPU

investigation was all about. Indeed, in moving to dismiss SPU's lawsuit, the State effectively conceded it had enforced the WLAD against Seattle Pacific by arguing *Younger* abstention. *See supra* "Facts" § C. In so doing, the State openly admitted that "enforcement action beg[an] with investigation into [SPU's] conduct." *Id.* In fact, the court dismissed the case "on Younger abstention grounds." MTD at 3.[1]

What's more, the threat of enforcement is "bolstered by the fact" that third-parties can file complaints with Defendants, causing administrative investigations—itself "harm sufficient to justify pre-enforcement review." *SBA List,* 573 U.S. 164–65; *Italian Colors*, 878 F. 3d at 1173 (private right of action supports fear of enforcement). Just like in *SBA List*, "any person claiming to be aggrieved" under the WLAD may file a complaint. WRC § 49.60.230. And here, the threat of third-parties doing so is not imaginary. The Mission's religious hiring practices were already lambasted online by hundreds of users, some of whom threatened to "apply" at the Mission only to file discrimination complaints. VC ¶ 154. Any day a complaint could be filed, thus triggering an administrative investigation where the State can use a variety of tools to demand documents, subpoena witnesses, and force other compliance, including through the "additional threat of criminal prosecution." *SBA List,* 573 U.S. 166; WRC § 49.60.310. This "suffices to create an Article III injury." *SBA List,* 573 U.S. 166.

---

[1] The State's theory of "no enforcement equals no standing" but "enforcement equals abstention" would effectively deprive federal courts of jurisdiction to hear pre-enforcement challenges.

1

**B.    The Mission's injury is traceable to Defendants.**

2        The State asserts the causation element of standing is lacking because third

3    parties caused the Mission's injuries. MTD at 11. Not so. The State's argument

4    misses the mark because it ignores the Mission's true injury: Defendants'

5    imminent threat of *enforcement of the WLAD* and the penalties and liability the

6    Mission would incur thereunder. So while the Mission's media blowback, threats,

7    and use of *Indeed.com* increased the likelihood that a complaint would be filed

8    against the Mission, its injury—penalties under the WLAD—remains traceable to

9    the Defendants. *See* VC ¶¶ 14, 144–146, 160–169 (alleging and explaining that

10   *Defendants' enforcement* of the WLAD is injuring the Mission).

11       It is well-settled that in § 1983 actions challenging the constitutionality of a

12   state law that a state official's "power" to enforce the challenged provision

13   "demonstrates the requisite causal connection for standing purposes." *Planned*

14   *Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004); *accord*

15   *Sullivan v. Ferguson*, No. 3:22-CV-05403-DGE, 2022 WL 13969427, at *4 (W.D.

16   Wash. Oct. 24, 2022) ("That state officials are entrusted with the enforcement of

17   state criminal laws and have the actual power to enforce allegedly unconstitutional

18   laws is sufficient to demonstrate" causation.). Here, the named Defendants' have

19   authority to enforce the WLAD. *See supra* "Facts" § I.B.

20       In addition to the fact that the Mission's injury was not solely traceable to

21   third parties not before the Court, "causation may be found even if there are

22   multiple links in the chain connecting the defendant's unlawful conduct to the

23   plaintiff's injury." *Skyline Wesleyan Church v. California Dep't of Managed Health*

1    *Care*, 968 F.3d 738, 748 (9th Cir. 2020). Even then, the State's so-called "chain of

2    events" all point back to one thing: Defendant Ferguson's enforcement of the

3    WLAD against Seattle Pacific. *See* MTD at 11 (stating the "AGO's letter to SPU"

4    started the chain of events).

5    But the Court need not even look at that scenario, because here "the named

6    defendants possess authority to enforce the [WLAD]," so the "causation element of

7    standing" is met. *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (cleaned

8    up); *accord Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). By

9    continuing to enforce its Christian behavior requirements and hire only

10    coreligionists, the Mission faces a credible threat of WLAD enforcement, which is

11    directly traceable to the Defendants—the officials who enforce it.

12    **C.    The Mission's injury is redressable by a favorable court decision.**

13    "A plaintiff meets the redressability requirement if it is likely, although not

14    certain, that his injury can be redressed by a favorable decision." *Wolfson v.*

15    *Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010). Thus, the Mission's "burden to

16    demonstrate redressability is relatively modest." *M.S. v. Brown*, 902 F.3d 1076,

17    1083 (9th Cir. 2018) (cleaned up). The Court can redress the Mission's claimed

18    injury—penalties and enforcement under the WLAD—by declaring the WLAD's

19    application to the Mission violates its First Amendment rights and by enjoining the

20    Defendants from enforcing the WLAD against the Mission for engaging in its

21    constitutional rights. *See* VC, "Prayer for Relief," at 50–51. The State offers two

22    rebuttals; neither change this outcome.

23

**1.  The Mission's injury stems from the enforcement of the WLAD.**

First, the State sets up a straw man, then knocks it down. The State says this Court lacks the remedial power because the Mission is asking this Court to "review[ ] [the Washington Supreme Court's decision in] *Woods* and declar[e] that it was wrongly decided." MTD at 15–16. That is just flat wrong.

What the Mission *is* asking this Court to do is to declare that the State's enforcement of state law against the Mission infringes its constitutional rights and to enjoin that enforcement so the Mission can continue exercising those rights. Such requests are ordinary. *E.g., Tingley*, 47 F.4th 1055. To be sure, in *Woods* the Washington Supreme Court judicially rewrote the WLAD by narrowing the religious employer exemption. But that is no different than if the Washington Legislature decided to remove the WLAD's religious employer exemption through the legislative process. Either way the result is the same: the Mission is no longer exempt from claims of sexual orientation discrimination under the WLAD. And either way, the named Defendants enforce the WLAD. After *Woods*, Defendants could have decided not to enforce the new interpretation of the WLAD against religious organizations. Instead, they launched an investigation into SPU, using the WLAD as the basis. *See* ECF No. 1-5. It is the unconstitutional enforcement of the WLAD—not the genesis of the change in the law—that injures the Mission and which this Court can redress by enjoining the Defendants.

Besides, *Woods* only dealt with Washington state law issues and did not address any of the *federal* constitutional claims the Mission asserts in this case. *See Woods,* 197 Wash. at 252. Indeed, in opposing Seattle's Union Gospel Mission's

petition for a writ of certiorari to the Supreme Court, the State admitted that the *Woods* "opinion focuse[d] on the state constitution, not the First Amendment" and "did not consider or address whether the First Amendment mandates a coreligionist exemption." Brief in Opposition to Petition for Writ of Certiorari at 15, *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022) (No. 21-144), 2021 WL 5138203, at *15–16. The Mission is not asking this Court to "review" the *Woods* decision, which did not address the federal constitutional issues implicated here.

The State's argument is also foreclosed by *Wolfson v. Brammer,* 616 F.3d 1045, 1056 (9th Cir. 2010). In *Wolfson* a judicial candidate challenged several canons of the Arizona Code of Judicial Conduct as restricting his speech. *Wolfson*, 616 F.3d at 1051–53. He sued members of the state disciplinary commissions, who argued his claimed injuries were not redressable because "they ha[d] no legal authority to change the Code. Instead, that authority [was] reserved to the Arizona Supreme Court." *Id.* at 1056. The Ninth Circuit rejected this argument: because the "defendants have the power to discipline Wolfson and, if they are enjoined from enforcing the challenged provisions, Wolfson will have obtained redress in the form of freedom to engage in certain activities without fear of punishment." *Id.*

Same here. The Mission "need not obtain a [WLAD] revision" to "obtain a measure of relief." *Id.*; *see also Skyline*, 968 F.3d at 749–51 (holding that a church's injuries were redressable by an injunction prohibiting the enforcement of California's abortion coverage requirement, regardless of the "[r]equirement's source in state law"). As such, declaratory and injunctive relief provides real relief from a discrete injury traceable to the government.

2.    **The remedy need only redress *some* of the Mission's injury.**

Second, the State asserts that even with remedial relief from this Court, the Mission could still face private lawsuits. MTD at 16. That is true, but it doesn't defeat redressability. "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982). The Mission's injury is redressable because its "risk [of harm] would be reduced *to some extent* if [the Mission] received the relief [it] seek[s]." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) (emphasis added).

## II.    This case is ripe.

This case is also ripe. For prudential ripeness, courts assess (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Skyline*, 968 F.3d at 751–52 (cleaned up). Prudential ripeness is "discretionary," *Thomas v. Anchorage Equal Rts. Comm'n,* 220 F.3d 1134, 1142 (9th Cir. 2000), but federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Skyline*, 968 F.3d at 752 (cleaned up). This issue is purely legal and no further facts need developed. Since the *Woods* ruling, the State has said unequivocally that the WLAD prevents religious organizations from discriminating against non-ministerial employees based on sexual orientation. *See* VC ¶ 124. The record

shows the Mission's coreligionist hiring practices violate that pronouncement. So the only question is: "does the WLAD's prohibition on sexual orientation discrimination as applied to the Mission violate its constitutional rights?" And the challenged action—the State's enforcement of the WLAD—is final because it (a) "has a direct and immediate effect" on the Mission (it is already harming the Mission), (b) "has the status of law" (the WLAD *is* the law), and (c) "requires immediate compliance with its terms" (the State is currently enforcing it against similar organizations). *Skyline*, 968 F.3d at 752 (cleaned up).

Citing the Supreme Court's ministerial exception cases, the State argues more facts are needed so the Court can "assess whether the First Amendment protects" the Mission. MTD at 19. But the State misunderstands the Mission's constitutional claims; there is no ministerial exception claim, so the *Our Lady* and *Hosanna-Tabor* factors are irrelevant. Rather, the Mission asserts a right to hire coreligionists for *all* positions—ministerial or not—and needs judicial relief so it can fill its open IT technician and operations assistant positions, and post its hiring statements, without facing penalties for violating the WLAD. The only facts the Court needs to decide that legal issue are already before it: the Mission's religious beliefs and employment requirements. Lastly, because the Mission is suffering and will suffer an injury-in-fact, it will continue to face hardship absent relief from this Court. *See supra* § I.A; *Cf. Thomas*, 220 F.3d at 1142 ("absence of any real or imminent threat of enforcement ... seriously undermines any claim of hardship").

## CONCLUSION

The Court should deny the State's Motion to Dismiss.

Respectfully submitted this 26th day of April 2023,

*s/ Katherine Anderson*
Katherine Anderson
WA Bar No. 41707
AZ Bar No. 29490
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

1

**CERTIFICATE OF SERVICE**

2
    I hereby certify that on April 26th, 2023, I electronically filed the foregoing

3
paper with the Clerk of Court using the ECF system which will send notification of

4
such filing to all counsel of record.

5
                           *s/ Katherine Anderson*

6
                             Katherine Anderson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Response in Opposition to Motion to Dismiss - 22