Katherine Anderson
WA Bar No. 41707
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **UNION GOSPEL MISSION OF YAKIMA, WASH.**, <br><br> *Plaintiff,* <br><br> v. <br><br> **ROBERT FERGUSON**, ET AL., <br><br> *Defendants.* | Civil Case No.: 1:23-cv-03027 <br><br> **PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> OCTOBER 11, 2024, AT 10:00 A.M. WITH ORAL ARGUMENT |

# TABLE OF CONTENTS

Table of Authorities.................................................................... iii

Introduction ....................................................................................1

Summary of Facts ..........................................................................3

    A.  The Mission's employment practices are essential to its religious
          purpose and calling. ..........................................................3

    B.  The WLAD applies to religious organizations...............................4

    C.  The Ninth Circuit holds the Mission has standing. ........................5

    D.  The Mission still faces harm for filling its non-ministerial
          positions...............................................................................6

Argument.......................................................................................8

    I.  The Mission is likely to succeed on its church autonomy claim......8

    A.  Church autonomy protects non-ministerial decisions....................8

    B.  Federal courts apply the church autonomy doctrine.......................9

    C.  The WLAD violates the Mission's autonomy................................11

    II.  The Mission is likely to succeed on its free exercise claim............12

    A.  The WLAD triggers strict scrutiny because it treats comparable
          secular groups better than the Mission.......................................13

    B.  The WLAD triggers strict scrutiny because it contains
          mechanisms for individualized exemptions. ..............................15

    C.  The WLAD cannot survive strict scrutiny....................................17

    III.  The Mission is likely to succeed on its expressive association and
          free speech claims. ...........................................................18

IV. An injunction protects the Mission's constitutional rights,

      prevents irreparable harm, and benefits the public interest.......19

Conclusion .............................................................................20

Certificate of Service ...............................................................22

# TABLE OF AUTHORITIES

**Cases**

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ................................................................. 18

*Bryce v. Episcopal Church in the Diocese of Colorado,*
289 F.3d 648 (10th Cir. 2002) ...................................... 9, 10, 11

*Butler v. St. Stanislaus Kostka Catholic Academy,*
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ................................... 10

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day
Saints v. Amos,*
483 U.S. 327 (1987) ......................................................... 10, 16

*Darren Patterson Christian Academy v. Roy,*
699 F. Supp. 3d 1163 (D. Colo. 2023) .................................. 18

*Equal Employment Opportunity Commission v. Mississippi College,*
626 F.2d 477 (5th Cir. 1980) ................................................ 11

*Fellowship of Christian Athletes v. San Jose Unified School District
Board of Education,*
82 F.4th 664 (9th Cir. 2023) ....................................... passim

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ............................................... 12, 16, 17

*Garrick v. Moody Bible Institute,*
412 F. Supp. 3d 859 (N.D. Ill. 2019) ................................... 10

*Green v. Miss United States of America, LLC,*
52 F.4th 773 (9th Cir. 2022) ............................................... 19

*Hall v. Baptist Memorial Health Care Corporation,*
215 F.3d 618 (6th Cir. 2000) .............................................. 10

*Health Freedom Defense Fund, Inc. v. Carvalho*,
104 F.4th 715 (9th Cir. 2024) ............................................................... 20

*Hosanna-Tabor Evangelical Lutheran Church & School v. Equal
Employment Opportunity Commission*,
565 U.S. 171 (2012) .............................................................................. 8

*Killinger v. Samford University*,
113 F.3d 196 (11th Cir. 1997) .............................................................. 11

*Little v. Wuerl*,
929 F.2d 944 (3d Cir. 1991) ................................................................. 11

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) ......................................................................... 8, 17

*Seattle Pacific University v. Ferguson*,
104 F.4th 50 (9th Cir. 2024) ............................................................ 5, 6

*Seattle Pacific University v. Ferguson*,
No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) ................................. 16

*Seattle's Union Gospel Mission v. Woods*,
142 S.Ct. 1094 (2022) ............................................................... 8, 10, 12

*Serbian Eastern Orthodox Diocese for United States of America &
Canada v. Milivojevich*,
426 U.S. 696 (1976) .............................................................................. 9

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) ................................................................. 18

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
41 F.4th 931 (7th Cir. 2022) ................................................................. 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .............................................................................. 5

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ............................................................... 13, 14

*Union Gospel Mission of Yakima Washington v. Ferguson,*
  No. 23-2606, 2024 WL 3755954 (9th Cir. 2024) ......................... passim

*Woods v. Seattle's Union Gospel Mission,*
  481 P.3d 1060 (Wash. 2021) ........................................... 5, 8, 16

*Youth 71Five Ministries v. Williams,*
  No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ..................... 15

**Statutes**

Wash. Rev. Code § 49.60.010 ............................................... 13

Wash. Rev. Code § 49.60.040 ............................................ 5, 13

Wash. Rev. Code § 49.60.180 ......................................... 5, 11, 16

Wash. Rev. Code § 49.60.208 ................................................ 5

Wash. Rev. Code § 49.60.222 ............................................... 13

**Regulations**

Wash. Admin. Code 162-16-240 .............................................. 16

**Constitutional Provisions**

42 U.S.C. § 2000 .......................................................... 18

1    The Ninth Circuit reversed and remanded this case and instructed

2  this Court "to decide [the Mission's] motion for a preliminary injunction

3  in the first instance." *Union Gospel Mission of Yakima Washington v.*

4  *Ferguson*, No. 23-2606, 2024 WL 3755954, at *3 (9th Cir. Aug. 12,

5  2024). The Mission renews its Motion for a Preliminary Injunction

6  ("MPI"), incorporates all arguments made therein, and supplements it

7  with this Memorandum and the Declaration of Scott Thielen. The

8  Mission requests that the Court enjoin Defendants from enforcing the

9  Washington Law Against Discrimination ("WLAD") against the Mission

10 for preferring and hiring only coreligionists—those who agree with and

11 adhere to its religious beliefs and behavior requirements—for all of its

12 positions, regardless of whether or not they are ministerial. [1]

## INTRODUCTION

14    The Mission is a Christian rescue mission that furthers its

15 ministry goal to live out and spread the Gospel of Jesus Christ through

16 all of its employees. To accomplish its religious calling, the Mission

17 must employ faithful agents who share and adhere to the Mission's

18 religious beliefs, both internally and externally. If it can't do this, it will

---

[1] The Mission previously requested an injunction to publish its Religious Hiring Statement without penalty. *See* ECF 14 at 7. The State has now said—eighteen months *after* this suit was filed and *after* the Ninth Circuit held the Mission has standing—that it "will not enforce the WLAD ... in connection with the positions and Religious Hiring Policy as identified in its Complaint and related attachments." ECF No. 31 at 2.

lose its uniqueness, fall short of its religious mission, and eventually will be reduced to a secular organization.

Yet the WLAD poses this exact threat to the Mission. It forces the Mission—on pain of substantial penalties—to employ those who do not share or live out the Mission's beliefs on marriage and sexuality. The Ninth Circuit held that the Mission need not sit and wait in fear for the State to come knocking—it can seek to enjoin this unconstitutional law *now*. After losing at the Ninth Circuit, the State now says—for the first time in 18 months of litigation—it will not enforce the WLAD as applied to the Mission's IT technician and operations assistant. But the State cannot suddenly say magic words to make this case go away. And it doesn't fix the problem, because the Mission challenges the WLAD as applied to all of its employees, regardless of position, and regardless of whether the State believes if one is religious enough to be "ministerial." The Mission needs to fill at least 14 open positions right now and up to 50 annually. If the WLAD is not enjoined, the Mission is required to seek the government's permission for every position it hires—an unworkable and unconstitutional task—and risks penalties for using its religiously based criteria to fill these positions. The Mission requires every employee to live out and share its faith. The government doesn't get to second-guess that decision.

1    The Mission is likely to succeed on its claims. First, the WLAD

2    infringes the Mission's autonomy to make employment decisions rooted

3    in its religious beliefs, regardless of position. Second, the WLAD

4    triggers—and fails—strict scrutiny because it is not neutral or generally

5    applicable for at least two reasons: (1) because it permits private

6    organizations, educational institutions, and small employers to

7    discriminate freely; and (2) because the State can make case-by-case

8    discretionary decisions about when the WLAD applies and when it

9    doesn't. Third, the WLAD violates the Mission's right to expressive

10   association.

11       This Court should issue an injunction to ensure the Mission can

12   fill all of its current open positions without incurring WLAD liability.

### SUMMARY OF FACTS

**A. The Mission's employment practices are essential to its religious purpose and calling.**

The Mission's Christian religious beliefs guide everything it does.
ECF No. 14-1 ¶¶ 8–9. Each day it offers desperately needed lodging,
food, and assistance to the less fortunate no matter who they are or
their beliefs, orientation, or identity. ECF No. 14-1 ¶ 10. The Mission's
foremost goal is to "spread the Gospel of the Lord Jesus Christ" in and
through all of its services. ECF No. 1-1 at 3. The Mission accomplishes
its goals through its 165-plus employees who represent the ministry as
its hands, feet, and mouthpiece. ECF No. 14-1 ¶¶ 21, 31; Thielen Decl. ¶

22. So the Mission only employs coreligionists—those who share and live out the Mission's religious beliefs, including the belief that "human sexual expression" is only proper "within the marriage of one man to one woman." ECF No. 14-1. ¶¶ 26, 34.

The Mission requires every employee to live out their faith inward-facing (toward other employees), which therefore contributes to the success of the ministry outward-facing (toward the community). Thielen Decl. ¶ 14. So every employee, regardless of position held, has inward-facing religious responsibilities to cultivate fellowship, engage in discipleship, and support one another in their faith journeys through their speech and actions. *Id.* ¶¶ 15–16. For example, employees worship together, pray for one another, share scripture and devotionals, and strive to exemplify to each other what it means to follow Christ in every respect. *Id.* ¶¶ 17–20. Working with likeminded Christians also helps ensure employees are not subjected to or willing participants in sinful habits, behaviors, and temptations. *Id.* ¶ 18. If the Mission is forced to hire someone who does not share its religious beliefs—including beliefs on marriage and sexuality—it cannot foster an inward community of co-believers, thus undermining the Mission's calling to spread the Gospel through its social welfare work. *Id.* ¶ 21, 25–26.

**B. The WLAD applies to religious organizations.**

The WLAD prohibits employers with eight or more employees from discriminating in employment based on sexual orientation. Wash.

Rev. Code §§ 49.60.040(11), 49.60.180. The WLAD used to exempt religious nonprofit organizations, but in 2021, the Washington Supreme Court "narrowed the religious-employer exemption to correspond to the ministerial exception under the U.S. Supreme Court's First Amendment jurisprudence." *Union Gospel Mission,* 2024 WL 3755954, at *1 (citing *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1069–70 (Wash. 2021)). The WLAD now applies to a religious organization's non-ministers. *Id.* at *2; *see also* ECF No. 23 at 16, 18 (finding the same). Besides employment *actions*, the WLAD's "disclosure provision" forbids the Mission from *asking* applicants "to disclose … sincerely held religious affiliation or beliefs." Wash. Rev. Code § 49.60.208.

**C. The Ninth Circuit holds the Mission has standing.**

The Ninth Circuit recently held Seattle Pacific University had standing to challenge future WLAD enforcement as applied to its religiously based employment decisions. *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024). Last month, the Ninth Circuit similarly held that the Mission had pre-enforcement standing under the three-prong test set out in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). *See Union Gospel Mission*, 2024 WL 3755954.

First, the Mission "mandate[s] that *all employees* ... adhere to its religious beliefs, which encompass those concerning its view of sexual morality." *Id.* at *2 (emphasis added). And the Mission "will continue to adhere to these hiring practices." *Id.* Second, the Mission's hiring

practices are arguably proscribed by the WLAD, because like *SPU*, they "apply" to "ministers and non-ministers alike." *Id.* (quoting *SPU*, 104 F.4th at 60). Third, the Mission faces a "credible threat of prosecution" because: (1) it "intends to engage in conduct arguably proscribed by multiple sections of the WLAD"; (2) "the State repeatedly refuse[s] to disavow enforcement to the extent that [the Mission] seeks to hire *non-ministerial employees*"; (3) "the State is only one enforcer of the WLAD"; and (4) the "WLAD, as interpreted by the Washington Supreme Court in *Woods* in 2021, is relatively new." *Id.* at *2-3 (emphasis added). The Ninth Circuit then held the Mission's claims were redressable and remanded for this Court to decide the MPI "in the first instance." *Id.*

### D. The Mission still faces harm for filling its non-ministerial positions.

On September 11, the State filed a Notice claiming for the first time—after eighteen months of litigation and after losing its standing fight—that it now will not enforce the WLAD "with respect to [the Mission's] IT Technician and Operations Assistant." ECF No. 31 at 2. But the Mission employs many non-ministers, hiring upwards of 50 per year. ECF No. 1 ¶¶ 128, 130; Thielen Decl. ¶ 22. Although the Mission noted the IT technician and operations assistant positions needed to be filled right away when it filed its MPI, the requested relief was not limited to those positions. ECF No. 14 at 7. Instead, the Mission sought (and still seeks) an injunction as applied to all positions *Id.*

1
2
3
4
5
6
7
8

The State tried (and failed) to do the same thing at the Ninth Circuit. There, before the court issued its decision but *after* oral argument, the State purported to "disavow enforcement as to ministers" and "concede[d]" that "the IT technician and operations assistant are ministers who 'minister to members of the public.'" *See* Appellees' Rule 28(j) Letter, DktEntry 50.1, *Union Gospel Mission*, No. 23-2606 (9th Cir. Aug. 12, 2024). But that didn't change the court's decision and nothing in its opinion isolated the issue to the two listed positions.

9
10
11
12
13
14
15
16
17
18
19

So the Mission still risks WLAD penalties by requiring any one of its many non-minister positions to adhere to its biblical beliefs on marriage and sexuality. Thielen Decl. ¶¶ 23–24. Moreover, the Mission is burdened by having to obtain permission from the State to use its religious hiring criteria before hiring someone. The Mission currently has at least 14 open positions, *id.* ¶¶ 5–6, including multiple non-ministers, like a Front Desk Coordinator, Thrift Store Associate, Meal Ministry Cook, Nurse, Programs Assistant, and Safety Team, *id.* ¶¶ 8, 11–12. And the Mission has frequent turnover for many positions. *Id.* ¶ 22. The Mission thus needs an injunction prohibiting enforcement of the WLAD as applied to all positions.[2]

20
21
22
23

---

[2] The Mission recognizes that it refers to every position as a "minister," and it does so because all are expected to share the Christian faith. Thielen Decl. ¶ 9; ECF No. 1-4. But the Mission also understands that the Supreme Court has stated that "a variety of factors" determines if a

<u>A<small>RGUMENT</small></u>

**I.    The Mission is likely to succeed on its church autonomy claim.**

**A. Church autonomy protects non-ministerial decisions.**

The Religion Clauses "protect" the Mission's "autonomy with respect to internal management decisions that are essential to [its] central mission." *Our Lady,* 591 U.S. at 746. One "component of this autonomy" is the ministerial exception. *Id.* The ministerial exception protects a religious organizations' decisions about its ministers whether or not the decision is based on religious grounds. *See id.* at 746–47; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). This case is not about the ministerial exception because the Mission remains exempt from the WLAD for its ministerial decisions. *Woods*, 481 P.3d at 1067.

But church autonomy is a "broad principle," *Our Lady*, 344 U.S. at 747, and "is not so narrowly confined" to the ministerial exception, *Seattle's Union Gospel Mission v. Woods*, 142 S.Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari). Another component protects the Mission's freedom to make decisions for *all* employees free

_____

position is protected by the ministerial exception, and "[s]imply giving an employee the title of 'minister' is not enough to justify the exception." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 751–52 (2020). So the Mission does not believe that every position would qualify for the ministerial exception under the legal test. Thielen Decl. ¶ 10.

from penalty when those decisions are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 660 (10th Cir. 2002). Church autonomy thus protects the Mission's right to require all of its employees to follow "the standard of morals required of them." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976) (cleaned up).

In short, the Mission cannot be penalized when it makes personnel decisions rooted in its religious belief, practice, or adherence, no matter how others label that decision. *Bryce*, 289 F.3d at 660; *see also Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J., concurring) ("that [Catholic school's] adherence to Roman Catholic doctrine produces a form of sex discrimination does not make the action less religiously based").

**B. Federal courts apply the church autonomy doctrine.**

*Bryce* illustrates how church autonomy works in the face of employment discrimination law. There a church terminated its youth pastor after discovering she was in a same-sex union. *Bryce*, 289 F.3d at 651–53. The former pastor sued for sex discrimination under Title VII. *Id.* The Tenth Circuit explained that a religious organization's "constitutional protection extends beyond the selection of clergy to other internal church matters." *Id.* at 656. The court then declined to apply the ministerial exception and held the "broader church autonomy doctrine" barred the former pastor's claims because the church's

termination decision was "based on religious doctrine." *Id.* at 656–58, 658 n.2, 660; *accord Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 188, 198–204 (E.D.N.Y. 2022), *appeal dismissed* (Aug. 26, 2022) (sexual orientation discrimination claim barred by the church autonomy doctrine "[e]ven if [teacher] did not qualify as a ministerial employee" because school "proffered a religious reason for termination"); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871–73 (N.D. Ill. 2019) (church autonomy barred claim where reasons for termination "were rooted firmly in [college's] religious beliefs").

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos* buttresses the church autonomy doctrine. 483 U.S. 327 (1987). There the Supreme Court explained how—absent an exemption for religious organizations—Title VII would force religious groups to alter the way they "carry out their religious missions" to avoid "potential liability," *id.* at 335–36, thereby "burden[ing] the exercise of religion," *id.* at 338.

And "courts of appeals have generally protected the autonomy of religious organization to hire personnel who share their beliefs." *Seattle's Union*, 142 S.Ct. at 1095; *see, e.g.*, *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) (religious groups have a "constitutionally-protected interest ... in making religiously-motivated employment decisions"); *Little v. Wuerl*, 929 F.2d 944, 947, 951 (3d Cir.

1991) (penalizing Catholic school for employment decision "would arguably violate both [Religion Clauses]"); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (Title VII's religious exemption avoids "conflicts [with] the religion clauses"); *Killinger v. Samford Univ.*, 113 F.3d 196, 201 (11th Cir. 1997) (same).

**C. The WLAD violates the Mission's autonomy.**

The WLAD infringes the Mission's autonomy by forbidding it from "refus[ing] to hire" or "discharg[ing] or bar[ring] any person from employment" because of "sexual orientation." Wash. Rev. Code § 49.60.180. With no statutory protection for the Mission remaining, the Religion Clauses must step in to protect its employment "decision[s] based on religious doctrine." *Bryce*, 289 F.3d at 660.

The Mission requires *every employee*—no matter the position—to share and follow its beliefs on marriage and sexuality so that it presents a credible, consistent, and accurate message to the world. ECF No. 14 ¶ 44. And it ensures the Mission creates an internal environment of co-believers who are "united in the same mind," who "exhort one another," and who "bear" each other's "burdens." Thielen Decl. ¶ 19 (quoting *I Corinthians* 1:10, *Hebrews* 3:13, and *Galatians* 6:2). This deepens employee relationships and contributes to the overall success of the ministry in sharing and spreading its Christian faith.

For example, the Mission needs to hire a front desk coordinator, a nurse, and a cook (among other positions). As with all positions, these

employees must "demonstrat[e] the calling, character and competencies of a person who seeks to faithfully follow Jesus" and must "spiritually car[e] for all those in [their] sphere of influence, including staff, clients, volunteers, and community partners." Thielen Decl., Ex. A at 2, 19, 38. So they are expected to "lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership." *Id*. The Mission must be able to decide for itself who is the best fit to accomplish these religious goals.

In sum, the WLAD mandates, on pain of substantial penalties, that the Mission hire those who do not share its beliefs on marriage and sexuality. This "undermines [its] autonomy" and "continued viability." *Seattle's Union*, 142 S.Ct. at 1096. Eventually, the Mission will be reduced to a secular social welfare organization, destroying the very purpose for which it was founded 88 years ago. The Mission "does not seek to impose [its] beliefs on anyone else," it only desires to "continue serving" the people of Yakima while adhering to its faith. *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021). Church autonomy protects this right and bars enforcement of the WLAD against the Mission.

## II.   The Mission is likely to succeed on its free exercise claim.

The Mission is also likely to succeed on the merits of its free exercise claim because the WLAD is not neutral or generally applicable and cannot satisfy strict scrutiny. *Id*. at 533. As explained in the MPI, the WLAD violates these "bedrock requirements." *Fellowship of*

*Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (cleaned up) ("*FCA*"); *see* ECF No. 14 at 19–21.

### A. The WLAD triggers strict scrutiny because it treats comparable secular groups better than the Mission.

First, a law is "not neutral or generally and therefore trigger[s] strict scrutiny ... whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). One exception is enough. *Id.* WLAD contains several.

The WLAD treats comparable secular organizations better than the Mission. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62. Here, the State's interest is to "eliminat[e] and prevent[ ] discrimination." Wash. Rev. Code § 49.60.010. But the WLAD exempts "distinctly private" organizations from its public accommodation arm, *id.* § 49.60.040(2), and permits public or private educational institutions to separate and give preferential treatment based on sex, *id.* § 49.60.222(3). And the WLAD exempts employers (even *for-profit* ones) with fewer than eight employees. *Id.* § 49.60.040(11). These exemptions blatantly allow secular organizations "to discriminate expressly—even on otherwise protected grounds" thereby undercutting the State's claimed interest. *FCA*, 82 F.4th at 689.

It doesn't matter that small religious employers are also exempt, as the State has argued. *See* ECF No. 16 at 13. Nor does it matter that the other exemptions pertain to public accommodations and housing. *Tandon* "summarily rejected" such a narrow rule. *See* 593 U.S. at 64. What matters is if the State permits *any* comparable secular conduct that undermines its interests. *Id.* at 62. The secular conduct need not be identical. For instance, the majority in *Tandon* rejected the dissent's view that in-home secular gatherings were "the obvious comparator" to in-home religious gatherings *Id.* at 65 (Kagan, J., dissenting). Instead, the Court held *in-home* religious gatherings were "comparable" to less-regulated *public* gatherings because both posed the same risk to the state's interest in stopping Covid. *Id.* at 63–64.

And consider the Ninth Circuit's recent en banc decision in *FCA*, which was decided after the Mission appealed the dismissal order. 82 F.4th 664. There, a public school district stripped a Christian student group of official status because the group—which "welcome[d] all students" to join—required its leaders to affirm its "core religious beliefs." *Id.* at 672. The school district asserted interests in "prohibiting discrimination" and "ensuring equal access for all students." *Id.* at 689. But the Ninth Circuit held that the nondiscrimination policies were not neutral or generally applicable because other secular clubs were permitted to "discriminate expressly—even on otherwise protected

grounds." *Id.* The South Asian Heritage Club and Senior Women Club, for example, could restrict membership based on ethnicity and sex. *Id.* at 688–89. Even though these groups discriminated differently, their "exclusionary membership requirements pose[d] an identical risk to the [d]istrict's stated interest in ensuring access for all student[s] to all programs." *Id.* at 689.

*Tandon* and *FCA* control here. The WLAD purports to eliminate and prevent discrimination but small secular employers, private organizations, and educational institutions can discriminate freely. And they're comparable to the Mission because they present the same "risk" to the State's interest in eliminating and preventing discrimination. However sliced, "there is no meaningful constitutionally acceptable distinction between the types of [discrimination] at play here." *Id.*; *see also Youth 71Five Ministries v. Williams,* No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (Oregon violated Free Exercise Clause under *Tandon* and *FCA* by awarding grants to secular groups that discriminated in "providing services" but denying grants to a religious organization that required employees to share its religious beliefs). As a result, strict scrutiny applies. *FCA*, 82 F.4th at 690.

**B. The WLAD triggers strict scrutiny because it contains mechanisms for individualized exemptions.**

The WLAD also uses "a mechanism for individualized exemptions" that allows the State "to decide which reasons for not complying with

1  [the WLAD] are worthy of solicitude." *Fulton*, 593 U.S. at 533, 537.

2  First, application of the WLAD's religious employer exemption, post-

3  *Woods*, now depends on the State's case-by-case assessment of whether

4  a particular position is religious enough to merit "ministerial"

5  protection. *Woods*, 481 P.3d at 1067 (explaining the "appropriate

6  parameters" of the statutory exemption is fact specific). In fact, the

7  Attorney General admitted that his office will investigate religious

8  organizations in order to "sort[ ] out" and "categor[ize]" employees to

9  "determine which positions are ministerial and which are not." Reply in

10  Supp. of Mot. to Dismiss at 6, *Seattle Pac. Univ. v. Ferguson*, No. 3:22-

11  cv-05540 (W.D. Wash. Oct. 26, 2022). This places a "significant burden"

12  on the Mission by requiring it, "on pain of substantial liability, to

13  predict" which of its 165-plus positions the State "will consider

14  religious" to merit protection. *Amos*, 483 U.S. at 336.

15      Second, the Commission can allow employment discrimination if it

16  decides it is "based upon a bona fide occupational qualification." Wash.

17  Rev. Code § 49.60.180(1). The BFOQ is "an exception to the rule that an

18  employer ... may not discriminate on the basis of protected status."

19  Wash. Admin. Code 162-16-240. And it applies in the Commission's sole

20  discretion when it "believes" a "protected status will be essential to or

21  will contribute to the accomplishment of the purposes of the job." *Id*.

22  This discretion defeats general applicability. And requiring the Mission

23

1  to seek permission to hire coreligionists for each position before actually

2  doing so "risk[s] [government] entanglement in religious issues," *Our*

3  *Lady*, 591 U.S. at 761, is unworkable, and poses an additional

4  unconstitutional burden on the Mission's religious exercise.

5        Whether it be the State's application of the religious employer

6  exemption or the BFOQ, one thing is clear: the State is able to decide

7  what reasons for not complying with the WLAD are permissible. This

8  "broad discretion to grant exemptions on less than clear considerations

9  removes [the WLAD] from the realm of general applicability and thus

10  subjects [it] to strict scrutiny." *FCA*, 82 F.4th at 688.

11  **C. The WLAD cannot survive strict scrutiny.**

12        The WLAD cannot survive strict scrutiny unless "it advances

13  interests of the highest order and is narrowly tailored to achieve those

14  interests." *Fulton*, 593 U.S. at 541. And the State cannot rely on a

15  "broadly formulated" interest in preventing discrimination "generally"

16  but must have "an interest in denying an exception" to the Mission. *Id.*

17  The State lacks such an interest. There is no legitimate justification for

18  forcing the Mission to hire those who do not share and live out its

19  religious beliefs. And the WLAD's other exemptions "undermine" any

20  contention that the State's interest in eradicating discrimination "can

21  brook no departures." *Id.* at 542.

22        Nor is the WLAD narrowly tailored. If the State "can achieve its

23  interests in a manner that does not burden religion, it must do so." *Id.*

1    at 541. For over 70 years Washington advanced its interests while

2    exempting nonprofit religious organizations. What's more, federal law

3    proves such an accommodation is more than possible. *See* 42 U.S.C. §

4    2000e1(a) (religious organizations can prefer "individuals of a particular

5    religion to perform work connected with the carrying on ... of its

6    activities"). The WLAD fails strict scrutiny as applied to the Mission.

7    **III.   The Mission is likely to succeed on its expressive**
        **association and free speech claims.**

8
         The WLAD also violates the Mission's First Amendment right "to

9    associate with others in pursuit of ... religious ... ends[,]" including its

10   "freedom not to associate" with people who "may impair [its] ability" to

11   express its views. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48

12   (2000); *see* ECF No. 14 at 21–22. The State's lone response thus far is to

13   argue that this right somehow does not apply because the Mission pays

14   its employees. ECF No. 16 at 15–16. But the right to expressive

15   association applies even in the employment context. For instance, the

16   Second Circuit held the right to expressive association allows an

17   employer "to limit its employees to people who share its views and will

18   effectively convey its message." *Slattery v. Hochul,* 61 F.4th 278, 291 (2d

19   Cir. 2023); *accord Darren Patterson Christian Acad. v. Roy,* 699 F.

20   Supp. 3d 1163, 1184 (D. Colo. 2023) (forcing Christian school to "hire

21   those who disagree with its religious expression and evangelistic

22   mission" violates expressive association); *see also Green v. Miss United*

23

1    *States of Am., LLC,* 52 F.4th 773, 804–05 (9th Cir. 2022) (Vandyke, J.,

2    concurring) (similar). So this also triggers strict scrutiny, which the

3    State cannot survive. *See supra* § II.C.

4        Further, the disclosure provision restricts the Mission from asking

5    potential employees about their religious beliefs about marriage and

6    sexuality. *See* ECF No. 14 at 23–25. The State had argued that the

7    disclosure provision "does not restrict [the Mission's] speech in any

8    way." ECF No. 16 at 19. But the Ninth Circuit effectively rejected this

9    argument, holding that the Mission's "requirement that employees and

10    prospective employees disclose their sincerely held religious affiliation

11    or beliefs[ ] arguably violates" the disclosure provision. *Union Gospel*

12    *Mission*, 2024 WL 3755954, at *2.[3]

13    **IV.  An injunction protects the Mission's constitutional rights,**

14    **prevents irreparable harm, and benefits the public**

      **interest.**

15        The Mission satisfies the remaining factors for a preliminary

16    injunction. The Mission suffers irreparable harm every single day by

17    being put to the choice of risking potential WLAD liability for hiring

18    according to its faith, or freezing hiring altogether—which would

19    eventually cause the Mission to shut its doors. In any event,

20    "irreparable harm is relatively easy to establish in a First Amendment

21

22    [3] As explained in the MPI, the Mission also requests an injunction to

23    permit it to ask employees and prospective employees about their

      religious beliefs, including those beliefs on marriage and sexuality.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 19

case because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." *FCA*, 82 F.4th at 694–95 (cleaned up). The Mission has done more than that here.

Nor does the State's notice of enforcement about the IT technician and operations assistant change this. First, the Mission seeks an injunction protecting it from WLAD liability for filling any one of its many non-ministerial positions. That's upwards of 50 positions a year— and 14 right now—not just the IT technician and operations assistant. ECF No. 1 ¶ 130. Second, the State's sudden "about-face occurred only after vigorous questioning at argument" before the Ninth Circuit, suggesting that it is motivated "by litigation tactics." *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 723 (9th Cir. 2024). This "timing is suspect" and "[l]itigants" who attempt to "tactically manipulate the federal courts in this way should not be given any benefit of the doubt." *Id.*

Lastly, the balance of hardships "tip[ ] sharply" in the Mission's favor because it has "raised serious First Amendment questions," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *FCA*, 82 F.4th at 695 (cleaned up).

## CONCLUSION

The Court should issue a preliminary injunction.

Respectfully submitted this 20th day of September, 2024,


s/ Katherine Anderson
Katherine Anderson               Jacob E. Reed*
WA Bar No. 41707                 VA Bar No. 97181
Ryan Tucker*                     ALLIANCE DEFENDING FREEDOM
AZ Bar No. 034382                44180 Riverside Parkway
Jeremiah Galus*                  Lansdowne, VA 20176
AZ Bar No. 30469                 Telephone: (571) 707-4655
ALLIANCE DEFENDING FREEDOM       jreed@ADFlegal.org
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## CERTIFICATE OF SERVICE

I hereby certify that on September 20th, 2024, I electronically filed the foregoing paper with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record.

*s/ Katherine Anderson*
Katherine Anderson